Daniel CHAPMAN and Jacque
Stockman, Plaintiffs,

v.

Ben MEIER, Secretary of State for the
State of North Dakota, Defendant.

Civ. No. 4664.

United States District Court,
D. North Dakota,
Southeastern Division.

Aug. 1, 1975.

Supplemental Opinion Dec. 17, 1975.

John D. Kelly, Fargo, N. D., for plaintiffs.

Robert P. Brady, Bismarck, N. D., for defendant.

Before BRIGHT, Circuit Judge, BENSON, Chief District Judge, and VanSICKLE, District Judge.

## MEMORANDUM OPINION AND ORDER

VanSICKLE, District Judge.

This action represents another chapter in the continuing case of legislative reapportionment in the State of North Dakota.

By order and opinion dated June 30, 1972, a majority of this Court adopted the Dobson Plan as an interim reapportionment plan for the North Dakota Legislature, effective for the 1972 elections only. 372 F.Supp. 363. By order and opinion dated January 30, 1974, a majority of this Court adopted the Dobson Plan as the permanent reapportionment plan for the North Dakota Legislature. 372 F.Supp. 371.

By decision dated January 27, 1975, the United States Supreme Court struck

down the Dobson Plan on the basis that population variances among legislative districts offended the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975).

Thereafter, the Forty-fourth Legislative Assembly of the State of North Dakota adopted the Dobson Plan (with subdistricting for multi-senator districts), hereafter referred to as Dobson II, as the apportionment plan for the North Dakota Legislature. Senate Bill 2497. The Governor of North Dakota allowed Senate Bill 2497 to become law without his signature, and it took effect as of July 1, 1975.

In a supplemental complaint to their amended complaint of May 8, 1972, Plaintiffs contend that Dobson II offends the Equal Protection Clause in that population variances among legislative districts are too large. Plaintiffs ask this Court to declare Dobson II invalid, permanently enjoin its implementation by Defendant, and establish a constitutionally valid apportionment plan for the North Dakota Legislature.

Under the original Dobson Plan, the State was divided into 38 districts, with all but five of the districts having one senator and two representatives. The five multi-senator districts were the 5th, 18th, 21st, 29th, and 32nd, having 4, 4, 5, 2, and 3 senators, and 8, 8, 10, 4, and 6 representatives, respectively. Thus, under the original Dobson Plan, there was a total of 51 senators and 102 representatives.

The population of the State according to the 1970 census was 617,761. Ideally, each district should have had 12,112 persons per senator under the original Dobson Plan. In fact, however, District 11 had a population of 10,728 and so was overrepresented by 11.43%, while District 4 had a population of 13,176 and so was underrepresented by 8.78%. Thus, the total variance under the original Dobson Plan was 20.21%.

Under Dobson II, the North Dakota Legislature merely modified the Dobson Plan by subdividing the multi-senator districts into single-senator subdistricts—with one exception. District 5, though having four senators under the original Dobson Plan, was divided into only three subdistricts—5A, 5B, and 5C—with 5A having two senators. Thus, Dobson II split the State into 50 districts/subdistricts with District 5A being a two-senator subdistrict.

In formulating Dobson II, the Legislature took into account new population data which was available concerning certain urban areas of the State. The population of the State was calculated at 619,037. Since the number of senators was still set at 51, ideally, each district/subdistrict should have had 12,138 persons per senator under Dobson II. In fact, however, District 11 still had a population of 10,728 and so was overrepresented by 11.62%, while District 4 still had a population of 13,176 and so was underrepresented by 8.55%. Thus, the total variance under Dobson II was 20.17%.[1] Indeed, there existed relatively minor differences between the deviations found in districts/subdistricts under Dobson II and deviations found in the same units under Dobson. Consequently, the net result of the Legislature's passage of Dobson II was the enactment of an apportionment plan with substantially the same deviations and total population variance found in Dobson, but with only one multi-senator subdistrict.

Plaintiffs present no challenge to the establishment of District 5A as a multi-senator subdistrict (or to the establishment of all the districts/subdistricts as multi-representative districts/subdistricts). Their sole contention is that the population variances found in Dobson II are constitutionally impermissible under the "one man-one vote" principle established by *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and its progeny.

---

1. A chart detailing the statistics relative to Dobson II can be found as an appendix to this opinion.

Of course, the United States Supreme Court has already validated Plaintiffs' contention in its analysis of the court-ordered Dobson Plan; and Dobson II suffers from substantially the same variances as Dobson itself. However, it is also true that a court-ordered plan "must be held to higher standards than a State's own plan." *Chapman v. Meier, supra,* 95 S.Ct. at 765. On the other hand, after examining purported justifications by the Court for the court-ordered Dobson Plan, the Supreme Court made the following observation:

> "Examination of the asserted justifications of the court-ordered plan thus plainly demonstrates that it fails to meet the standards established for evaluating variances in plans *formulated by state legislatures or other state bodies.* (Emphasis added.) The plan, hence, would fail even under the criteria enunciated in *Mahan v. Howell,* 410 U.S. 315 [93 S.Ct. 979, 35 L.Ed.2d 320] and *Swann v. Adams,* 385 U.S. 440 [87 S.Ct. 569, 17 L.Ed.2d 501]." *Id.,* 95 S.Ct. at 765.

We are thus faced with two questions: (1) Is the State compelled to come forward with justifications for the population variances found in Dobson II; i. e., do the variances found in Dobson II present a "prima facie" case of constitutional violations?[2] (2) If so, do the justifications which the State offers differ significantly from, or are they more persuasive than, justifications already presented to and rejected by the Supreme Court?

If the former question is answered "no," Dobson II must be sustained. If both questions are answered "yes", we must examine the justifications presented by the State to see if they are sufficient to sustain the variances found in the plan. If the former question is an-

swered "yes" and the latter "no," Dobson II must be struck down.

1.

DO THE VARIANCES FOUND IN DOBSON II PRESENT A "PRIMA FACIE" CASE OF CONSTITUTIONAL VIOLATIONS?

As recognized by the Supreme Court in *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), in reviewing a state apportionment plan, "minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Id.,* 412 U.S. at 745, 93 S.Ct. at 2327. However, in commenting on *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), which involved a state plan with a total variance of 16.4%, the *Gaffney* Court said that "as *Mahan v. Howell* demonstrates, population deviations among districts may be sufficiently large to require justification . . ." *Id.,* 412 U.S. at 745, 93 S.Ct. at 2327. Again, in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), in evaluating a state plan in which the total variance among districts was 9.9%, the Supreme Court said that "we cannot glean an equal protection violation from the single fact that two legislative districts . . . differ from one another by as much as 9.9%, when compared to the ideal district. Very likely, larger differences between districts would not be tolerable without justification 'based on legitimate considerations incident to the effectuation of a rational state policy,' *Reynolds v. Sims* . . .." *Id.,* 412 U.S. at 764, 93 S.Ct. at 2338.

Consequently, since the total variance found in Dobson II is in excess of 20%,

---

**2.** The Supreme Court may have answered this question "yes" when it said that "[e]xamination of the asserted justifications of the court-ordered plan thus plainly demonstrates that it fails to meet the standards established for evaluating variances in plans formulated by state legislatures . . .." *Chapman v. Mei-*

*er, supra,* 95 S.Ct. at 765. However, the total variance which may exist in a court-ordered plan before justifications must be presented is much smaller than the total variance which may exist in a legislative plan before justifications must be presented.

we find that a prima facie case has been made out, and the State is required to justify its plan.

## 2.

### DO THE JUSTIFICATIONS WHICH THE STATE OFFERS DIFFER SIGNIFICANTLY FROM, OR ARE THEY MORE PERSUASIVE THAN, JUSTIFICATIONS ALREADY PRESENTED TO AND REJECTED BY THE SUPREME COURT?

▮ We need not look far to find the justifications offered by the State to sustain the population variances found in Dobson II. Section 1 of Senate Bill 2497 contains a series of findings and declarations by the North Dakota Legislature.[3] The Legislature therein puts forward three major justifications for the the population variances found in Dobson II; namely, (1) the sparse population of rural areas of the State; (2) recognition of the natural boundary created by the Missouri River; and (3) the State policy of preserving county lines.

An analysis of the Supreme Court opinion striking down the court-ordered Dobson Plan, however, reveals that all three of these justifications were presented to and rejected by the Supreme Court.

"The basis for the District Court's allowance of the 20% variance is claimed to lie in the absence of 'electorally victimized minorities,' in the fact that North Dakota is sparsely populated, in the division of the State caused by the Missouri River, and in the goal of observing geographical boundaries and existing political subdivisions. We find none of these factors persuasive here, and none of them has been explicitly shown to necessitate the substantial population deviation embraced by the plan. . . .

" . . . [S]parse population is not a legitimate basis for a departure from the goal of equality. . . . Indeed, in a State with a small population, each individual vote may be more important to the result of an election than in a highly populated State.
. . .

" . . . [T]he suggestion that the division of the State caused by the Missouri River and the asserted state policy of observing existing geographical and political subdivision boundaries warrant departure from population equality is also not persuasive. It is far from apparent that North Dakota policy currently requires or favors strict adherence to political lines. As the dissenting judge in this case noted, appellee's counsel acknowledged that reapportionment proposed by the Legislative Assembly broke county lines, 372 F.Supp. [371], at 393 n. 22, and the District Court indicated as long as a

---

3. We evaluate these justifications relying on the principle that "actions speak louder than words." We are concerned that legislatures should not "ab initio" feel compelled to justify their actions to any court, anywhere. We feel that the language of the Supreme Court that

"[v]ery likely, larger differences [than 9.9%] between districts would not be tolerable without justification 'based on legitimate considerations incident to the effectuation of a rational state policy,'" *White v. Regester, supra,* 412 U.S. at 764, 93 S.Ct. at 2338, refers to the proof to be offered when a legislative act is attacked, and is different from "justification" or reasoning which a trial court is required to recite in its findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.

As to the usefulness and general value of a declaration of policy in a statute, see *Nutting,*

*Elliott, and Dickerson, Cases and Materials on Legislation,* at 580 (4th ed. 1969).

"In practice, unfortunately, the statement of purpose or policy has not been an unmitigated blessing. Too heavy reliance on such a clause leads to sloppy drafting elsewhere in the bill. ·The feeling that the court or administrator will somehow work out the tedious details and uncertainties tends to laziness and fuzzy thinking. Such a statement, therefore, should be relied on only insofar as its objectives cannot otherwise be achieved as a clear by-product of the concrete, working sections of the bill. In strict logic, it should be among the last sections drafted. If the rest of the bill is properly drafted, the need for a statement of purpose or policy usually disappears."

decade ago that the legislature had abandoned the strict policy. *Paulson v. Meier, supra,* 246 F.Supp. [36] at 42–43." *Chapman v. Meier, supra,* 95 S.Ct. at 764–765.

We might stop here and conclude that the State has presented no justification for the population variances in Dobson II which have not already been rejected by the Supreme Court in the context of Dobson itself. However, the words of the Supreme Court that "[i]t is far from apparent that North Dakota policy currently requires or favors strict adherence to political lines" urge us to examine anew the policy justification of preserving county lines, especially since the Legislature has made a declaration that it embraces such policy.

### 3.

### IS THE POLICY JUSTIFICATION OF PRESERVING COUNTY LINES SUFFICIENT TO SUSTAIN THE POPULATION VARIANCES FOUND IN DOBSON II?

"A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. . . .

" . . . So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-protection principle are constitutionally permissible. . . ." *Reynolds v. Sims, supra,* 377 U.S. at 578–79, 84 S.Ct. at 1390–1391.

It is rational for the North Dakota Legislature to desire to encourage voter participation (Senate Bill 2497, Section 1, Subsection 5), to prevent the disruption of existing district party organizations (Subsection 12), and to prevent voter disenchantment with the legislative process (Subsection 13); and pursuing a policy of preserving county lines may be a rational means of implementing such goals. But are "the divergences from a strict population standard [found in Dobson II] . . . based on . . . considerations *incident to* the effectuation of [the policy of preserving county lines] . . . ."?

There are 50 legislative districts/subdistricts provided for in Dobson II. The average percentile deviation from population equality among the 50 districts/subdistricts is ± 4.65%. Thirteen of the 50 districts/subdistricts actually break county lines; namely, Districts 2, 3, 6, 7, 17, 20, 23, 27, 31, 33, 35, 38 and 39. The average deviation among these 13 districts is ± 5.03%, while the average deviation among the 37 other districts/subdistricts is ± 4.51%. In short, the districts which in fact break county lines contribute more to the magnitude of the average deviation among the 50 districts/subdistricts than the districts/subdistricts which respect county lines.

Furthermore, 3 of the 8 districts/subdistricts [4] which have the largest population deviations—Districts 17, 23, and 33 —themselves cut through county lines. The 17th District, which is overrepresented by 11.59%, cuts through Walsh County; the 23rd District, which is overrepresented by 9.32%, cuts through Barnes County; and the 33rd District, which is underrepresented by 7.72%, cuts through Morton County. In short, there exists a variance of 19.31% between the 17th and the 33rd Districts, both of which districts break county lines.

Since districts which actually break county lines are more responsible for the magnitude of the average deviation than districts/subdistricts which respect county lines, and since there exists a variance of 19.31% between two districts which break county lines, we find that the population variances in Dobson II are not "incident to the effectuation of" the State's asserted policy of preserving the integrity of county lines.

---

4. The 8 districts/subdistricts are Districts 4, 11, 17, 19, 23, 29A, 33, and 36.

Accordingly, we hold that the asserted justification of preserving county lines is insufficient to sustain the population variances among the legislative districts/subdistricts found in Dobson II. We declare Dobson II (Senate Bill 2497) to be in violation of the Equal Protection Clause of the Fourteenth Amendment and permanently enjoin its implementation by the Defendant.

It is therefore ordered, that:

1. Thomas K. Ostenson, as special master of this court, is directed to submit a revised Ostenson Plan for Legislative redistricting of the State of North Dakota.

2. Mr. Ostenson is directed to consider the following criteria in formulating a plan:

   a. The natural boundary imposed by the Missouri River should be recognized and any proposed legislative district should not cross the river.

   b. Magnitude of the deviation of the district population, above or below the state average, should be kept at a minimum.

   c. Legislative district/subdistrict boundaries should coincide with political subdivision boundaries (county, township or precinct) to facilitate the work of election officials at election times.

   d. District compactness should be considered.

3. The Senate shall be maintained at 48 to 52 members.[5]

4. Each city entitled to more than one senator shall be divided into subdistricts, each subdistrict within the city containing an approximately equal number of persons. In subdistricting, Master-Ostenson shall take into account the latest census data available for the population of these cities; but in allocating the total number of senate and house seats for each city, the 1970 census data shall be used.

5. The Legislature shall consist of single-member senate districts or subdistricts and two-member house districts or subdistricts. Multimember senate districts or subdistricts shall be used only where unique circumstances require them.[6]

6. Legislative districts or subdistricts shall be drawn so as to recognize communities of interest arising out of natural barriers, political entities and common economic, social, ethnic, religious and other interests.

7. In formulating his proposed plan, the Special Master is authorized to confer with Special Master-Dobson, with Gail Hernett of Ashley, who chaired the special committee considering legislative redistricting in the 1973 North Dakota Legislative Session, and with other interested persons who may inform him of any special problems which may exist in connection with redistricting of any particular area of the state.

8. Special Master-Ostenson shall file his proposed plan and a detailed report describing the plan, explaining its operation, and the reasons for redistricting in the manner suggested with the court on or before the 1st day of September, 1975. This plan, detailed report, and readable maps shall be filed in not less than 20 copies and the Clerk is directed to immediately forward a copy of these documents to each judge and to counsel for the respective parties, and to make copies of the plan available for public inspection.

9. The Defendant shall be given 25 days, after September 1, 1975, to serve and file any comments or ob-

---

**5.** The standard in the 1975 reapportionment statute.

**6.** A possible example is Minot Air Force Base.

jections or requested modifications to the proposed plan.

10. Plaintiffs shall be given 15 days thereafter to file any comments or objections or requested modifications to the proposed plan and to respond to defendant's filing pursuant to paragraph 9, herein.

11. The parties shall file all documents in quadruplicate.

12. Upon the filing of the plan and any comments or suggestions to the plan by the parties to this litigation, the Clerk is directed to issue an order for hearing on whether or not the plan should be adopted or rejected by the Court. Said hearing shall be held on the 22nd day of October, 1975, at the Federal Courthouse in Fargo, at 10:00 o'clock, a. m. At that time, the Court will hear oral testimony from Mr. Ostenson regarding said plan. Should the parties desire to produce testimony in support of or in opposition to the plan, such testimony shall be taken by deposition and transcribed and filed for submission to the Court at or prior to the hearing thereon.

13. The Court directs all expenses and fees incurred by the Special Master shall be taxed as costs against the defendant.

14. The Special Master shall attempt to regionalize the state, the better to delineate areas of mutual economic, political, and geographical interests.

## APPENDIX

North Dakota population: 619,037
Ideal population per senator for 51 senators: 12,138

| District Number | No. of Senators | Pop. per Senator | % Deviation from Absolute Equality | Pop. Deviation from Equality per Senator |
|---|---|---|---|---|
| 1 | 1 | 12,250 | − .92 | 112 |
| 2 | 1 | 11,615 | +4.31 | 523 |
| 3 | 1 | 12,481 | −2.83 | 343 |
| 4 | 1 | 13,176 | −8.55 | 1038 |
| 5A | 2 | 12,440 | −2.49 | 302 |
| 5B | 1 | 12,367 | −1.89 | 229 |
| 5C | 1 | 12,502 | −3.00 | 364 |
| 6 | 1 | 11,840 | +2.46 | 298 |
| 7 | 1 | 12,956 | −6.74 | 818 |
| 8 | 1 | 11,251 | +7.31 | 887 |
| 9 | 1 | 11,549 | +4.85 | 589 |
| 10 | 1 | 12,858 | −5.93 | 720 |
| 11 | 1 | 10,728 | +11.62 | 1410 |
| 12 | 1 | 12,349 | −1.74 | 211 |
| 14 | 1 | 12,679 | −4.46 | 541 |
| 15 | 1 | 12,915 | −6.40 | 777 |
| 16 | 1 | 11,296 | +6.94 | 842 |
| 17 | 1 | 10,731 | +11.59 | 1407 |
| 18A | 1 | 12,639 | −4.13 | 501 |
| 18B | 1 | 12,664 | −4.33 | 526 |
| 18C | 1 | 12,580 | −3.64 | 442 |
| 18D | 1 | 12,756 | −5.09 | 618 |

| District Number | No. of Senators | Pop. per Senator | % Deviation from Absolute Equality | Pop. Deviation from Equality per Senator |
|---|---|---|---|---|
| 19 | 1 | 10,859 | + 10.54 | 1279 |
| 20 | 1 | 11,534 | + 4.98 | 604 |
| 21A | 1 | 12,121 | + .14 | 17 |
| 21B | 1 | 12,215 | − .63 | 77 |
| 21C | 1 | 12,210 | − .59 | 72 |
| 21D | 1 | 12,210 | − .59 | 72 |
| 21E | 1 | 12,274 | −1.12 | 136 |
| 22 | 1 | 11,448 | + 5.68 | 690 |
| 23 | 1 | 11,007 | + 9.32 | 1131 |
| 24 | 1 | 11,598 | + 4.45 | 540 |
| 25 | 1 | 12,799 | −5.45 | 661 |
| 26 | 1 | 12,913 | −6.38 | 775 |
| 27 | 1 | 12,392 | −2.09 | 254 |
| 28 | 1 | 11,362 | + 6.39 | 776 |
| 29A | 1 | 11,026 | + 9.16 | 1112 |
| 29B | 1 | 12,524 | −3.18 | 386 |
| 30 | 1 | 12,745 | −5.00 | 607 |
| 31 | 1 | 12,712 | −4.73 | 574 |
| 32A | 1 | 12,024 | + .94 | 114 |
| 32B | 1 | 11,223 | + 7.54 | 915 |
| 32C | 1 | 12,596 | −3.77 | 458 |
| 33 | 1 | 13,075 | −7.72 | 937 |
| 34 | 1 | 12,215 | − .63 | 77 |
| 35 | 1 | 12,158 | − .16 | 20 |
| 36 | 1 | 11,021 | + 9.20 | 1117 |
| 37 | 1 | 12,405 | −2.20 | 267 |
| 38 | 1 | 12,566 | −3.53 | 428 |
| 39 | 1 | 12,743 | −4.98 | 605 |

Total population (adding 5A twice)    619,037

Total deviations 232.31 (disregarding signs)
+ 4.65% = Average % deviation per district

BENSON, Chief Judge.

I respectfully dissent:

The reapportionment plan adopted by the majority of this Three-Judge Court, reported at 372 F.2d 371, was reversed by the Supreme Court in *Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975), which held that in the absence of persuasive justification, a court ordered reapportionment plan of a state legislature must avoid use of multi-member districts and "must ordinarily achieve the goal of population equality with little more than *de minimis* variation." 420 U.S. at 27, 95 S.Ct. at 766.

The Supreme Court has ruled, and this Court must, of course, accept and follow its directives. Such is the concept and strength of our system. However, this Three-Judge Court is again at odds with itself. The 1975 North Dakota Legislative Assembly, in response to the admonition of the Supreme Court in *Chapman*,[1] adopted a reapportionment plan

1. "We say once again what has been said on many occasions; reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather

which the majority finds to be not "constitutionally acceptable" because the population variances are substantially the same as the court ordered plan which the Supreme Court rejected.

I cannot agree with that finding. The court ordered plan was rejected because the district court did not explicitly show "significant state policies or other acceptable considerations that required the adoption of a plan with so great a variance". 420 U.S. at 24, 95 S.Ct. at 764. The holding of the Supreme Court was that a "court-ordered plan, however, must be held to higher standards than a State's own plan". 420 U.S. at 26, 95 S.Ct. at 765. *Chapman* did not designate the breaking point at which the plan would be acceptable if adopted by the state, but rejected if directed by the court.[2] As I see it, the crux of the *Chapman* decision is that a court plan that deviates from approximate population equality must be supported by enunciations of historically significant state policy or unique features, and that this court's asserted justifications failed to meet even the standards established for evaluating variances in plans formulated by state legislatures or other state bodies. The Supreme Court declared: "The plan, hence, would fail even under the criteria announced in *Mahan v. Howell* and *Swann v. Adams*." 420 U.S. at 26, 95 S.Ct. at 765.

The majority of this Court seizes upon this particular statement by the Supreme Court in finding the legislative plan invalid. In doing so, they seem to say that the legislative plan adopted by the 1975 Legislative Assembly[3] cannot be validated by any justification. I do not agree that the Supreme Court foreclosed the Legislature in this manner. While clearly under the rationale of *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and *Mahan*

*v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1972), the variance in this case required justification based on legitimate considerations incident to the effectuation of a rational state policy, I cannot agree that because the *court ordered plan* did not meet the criteria enunciated in *Mahan* and *Swann* that the defects arising out of the court's failure to explicitly show significant state policies or other acceptable considerations have not been cured by the Legislature.

Further, I do not believe that the suggestion in *Reynolds v. Sims* that variations from a pure population standard might be justified by such policy considerations as the integrity of political subdivisions, the maintenance of compactness and equality in legislative districts, or the recognition of natural or historical boundary lines, was meant to be exclusive. The legislature has found those justifications and other justifications, all of which it has explicitly set out as follows:

"SECTION 1. LEGISLATIVE FINDINGS AND DECLARATIONS.) The legislative assembly finds and declares that:

1. The senate should be maintained from forty-eight to fifty-two members in order to effectively represent the citizens of the state and to adequately review and study proposed legislation. By providing for such a size senate, a certain population variance is assured due to a combination of factors referred to in this section; however, although a legislative apportionment plan could possibly be formulated with a smaller population variance than the plan provided by this Act, such a plan would necessitate a smaller legislative assembly with geographically large legisla-

---

than of a federal court." *Chapman v. Meier,* 420 U.S. at 27, 95 S.Ct. at 766 (citations omitted).

2. Nor did the majority of this Court give any guidance when it ordered that the deviation of a revised Ostenson plan "should be kept at a minimum". It is definitely a matter of legisla-

tive discretion unless that discretion is clearly abused.

3. The plan was approved by the Senate by a vote of 44 to 7, and the House by a vote of 83 to 19.

lative districts which would substantially reduce the personal contact citizens have with their elected legislators. Such geographically large legislative districts would result from the fact that the state has a population density of only 8.9 residents per square mile and, in some instances, portions of the state comprise relatively uninhabited territory of up to 72 square miles.

2. Traditionally and historically, except for court-fashioned legislative apportionment plans, the state legislative assembly has been comprised of single-member senate districts and multi-member house districts.

3. Multi-member senate districts should be avoided in legislative apportionment plans unless a unique combination of factors justifies very limited use of multi-member senate districts. This very limited use of multi-member senate districts is not intended by the legislative assembly to establish a policy favoring multi-member senate districts. One district in the state, district 5, has a unique combination of factors which justifies a very limited use of a multi-member senate subdistrict. For legislative apportionment purposes, the population of the Minot air force base has been attached to the city of Minot due to the community of interest between residents of the city of Minot and air base personnel; however, the size of the air base is such that singularly it could be entitled to one senator and two representatives. Due to the military policy of discouragement of political activities by military personnel, the prohibition of political campaigning on military establishments, the transitory nature of military personnel, the fact that a large number of military personnel maintain their voting residences in their home state, and the fact that military personnel participation in state elections is minimal, the air base should not be a separate legislative district but should be combined with an urban subdistrict only to the extent necessary to provide for two senators and four representatives to be elected from that urban subdistrict.

4. The state has a policy dating from statehood in 1889 of preserving county boundaries in legislative apportionment plans. This policy was firmly established in section 29 of the state Constitution which provided that 'no portion of any county shall be attached to any other county, or part thereof, so as to form a district' and, although the section was amended in 1960, the substance of the amendment was to preserve the legislative districting plan then in effect which recognized county lines in every district. Even though the section, as amended, was found to violate the U.S. Constitution by a federal court, in every court-fashioned apportionment plan efforts have been made to hold violations of county boundaries to a minimum in deference to this strongly established state policy.

5. Voter identification with legislative districts is significant with regard to voter participation, and this identification with legislative districts extends to and includes identification with county boundaries.

6. The natural boundary caused by the Missouri River is very real in that one-third of the state lies west of the river, and of the three hundred fifty-five-mile length of the river only six crossings exist, four of which are located in urban areas. Any legislative district crossing the Missouri River would cause extreme hardship to the residents of the district and to the electoral process.

7. The sparse population of rural areas of the state, combined with the policy of maintenance of political subdivision boundaries and recognition of the natural boundary caused by the Missouri River, justifies deviations from population equality in legislative districts with this unique combination of factors.

8. An overemphasis on raw population figures provided by the 1970 census submerges state policy factors which are taken into account in legislative apportionment and ignore factors that are important to an acceptable apportionment plan for effective representative government.

9. It is extremely difficult to formulate a legislative apportionment plan with a small population variance among legislative districts and subdistricts without including some counties in portions of two or three legislative districts while at the same time realizing that population shifts and fluctuations in military and college student populations already make the 1970 census obsolete. This obsolescence is emphasized the reinforced by comparing the results of the 1970 census with the results of special census enumerations of Pembina County and the cities of Bismarck, Fargo, and Grand Forks.

10. In the northeast portion of the state, where the population of the rural districts is low in comparison to the population of other rural districts, the influx of people from the extensive military activity in the area immediately after the 1970 census has increased the population of those districts. While not represented in the 1970 census figures, this influx is recognized in the legislative apportionment plan and, if current population figures were used, the population deviation of those districts would be substantially lessened.

11. While there has been a general shift in population from rural to urban areas of the state, many of these newly established urban residents maintain close ties with their rural heritage and maintain voting residence in rural districts.

12. Substantial changes in existing legislative districts would cause disruption of district party organizations and would result in a disruption of voter identification with awareness to legislative district boundaries which were first established in 1972 and have been in effect for one special election, two primary elections, and two general elections.

13. Adoption of a legislative reapportionment plan substantially different from current North Dakota legislative apportionment would require that all state senators again stand for election in 1976, and additional drastic changes in legislative district boundaries would increase voter disenchantment with the legislative process and reduce the personal relationships many persons have with their elected representatives.

14. The legislative reapportionment plan ordered into effect on May 22, 1972, by the United States district court for the district of North Dakota was intended to have the least disruptive effect in changing legislative districts. In addition, the court-ordered plan recognized the established state policy of preserving political subdivision boundaries to the greatest extent practicable by violating only seven county boundaries in rural legislative districts.

15. Because of the state policies which encourage the minimization of disruption of electoral processes and the preservation of as many county lines as practicable, the present legislative apportionment plan is the best and most reasonable plan for the state until a new census is

conducted which includes population figures collected on a township and city block basis which would enhance the ability to reapportion on the basis of equal representation. Present census figures available for the 1970 census show that the census districts do not coincide with established township boundaries and, except for the city of Fargo, provide no accurate block census figures for the five largest cities of the state.

16. The methods and procedures employed by the census bureau in taking the census and the creation of census districts do not coincide with the boundaries of political subdivisions of the state. In an attempt to obtain accurate population data for political subdivisions and for block areas within certain cities, population figures have been interpolated and calculated under methods designed to reflect the population of those areas. Recognition is made of the fact that in fashioning the original legislative reapportionment plan, similar methods and procedures were used by the courts involved." Senate Bill 2497.

The statement in the majority footnote, "We evaluate these justifications relying on the principle that 'actions speak louder than words' ", is disturbing to me in that it seems to suggest the justifications found by the Legislature are mere "window dressing". When the Legislature exercises its constitutional duty, and by an overwhelming majority of both houses adopts a plan supported by an explicit list of justifications based on what it finds to be rational state policy, it behooves a court to attribute to that action a presumption of regularity and constitutionality.

The majority holds the Legislative plan is not constitutionally acceptable, and appoints Mr. Thomas Ostenson as special master to submit a revised plan. It is ironic that the criteria Mr. Ostenson is to follow, as directed by the majority of this Court, is patterned, with few variations, on the Legislature's statements of findings and declarations of justifications upon which it formulated its own plan. The Court would have Mr. Ostenson prepare a plan that would maintain the natural boundary of the Missouri River; maintain district compactness and existing political boundaries; maintain the numerical membership established by the Legislature; and keep the deviation of the district population above or below the state average at a minimum. The Legislature has done just that.

Mr. Ostenson is experienced and competent in the area of reapportionment. If he is able to carry out his assignment and fulfill the court's criteria, he will have accomplished something that appears to have eluded him when he previously submitted a plan to this court, which plan was considered and rejected by the 1975 North Dakota Legislative Assembly. To limit the variance to 5.95%, he found it necessary to break twenty-five county lines, and reduce the membership of the Legislative Assembly to forty-three senators and eighty-six representatives. Even this plan failed to meet the criteria of compactness in Districts 3, 14, and 15. Mr. Ostenson said more compactness in those districts are desirable but could be allowed ". . . only by dissecting more counties and making the boundaries more irregular."

The majority of this court, by some reasoning which I do not understand, ". . . find that the population variances in Dobson II are not 'incident to the effectuation of' the state's asserted policy of preserving the integrity of county lines." That conclusion appears to. be based on a finding that thirteen district/subdistricts "namely, Districts 2, 3, 6, 7, 17, 20, 23, 27, 31, 33, 35, 38 and 39" break county lines. The average deviations in those thirteen district/subdistricts is then found to be greater than the average deviation in the remaining thirty-seven district/subdistricts. It is totally illogical for the majority, if those figures are to have any validity, to ig-

nore district/subdistricts 1, 5A, 5B, 5C, 16, 18A, 18B, 18C, 18D, 19, 21A, 21B, 21C, 21D, 21E, 22, 24, 25, 32A, 32B, 32C, and 37, which district/subdistricts also do not totally preserve the integrity of county lines. Each of these district/subdistricts, omitted from the majority's computations, contain a portion of a county albeit in many instances it is part of the same county which appears in one or more districts. Further, the reasoning of the majority becomes more suspect if you note that the same situation prevails in four of the district/subdistricts it enumerated. Districts 6, 7, 38, and 39 each contain a portion of a county but actually break only two county lines. Districts 6 and 7 break McHenry County, and Districts 38 and 39 break Stark County.

The State policy sought to be implemented by the Legislature is the preservation of county boundaries, and an examination of the Legislative Plan discloses that all but eleven of the fifty-three county lines remain intact. It would seem self evident that for the State to achieve basic compliance with the criteria of *Reynolds,* some county lines must be broken, and the State should not thereby be accused of failing to implement its asserted policy.

"The District Court intimated that one reason for rejecting the justification for divergences offered by the State was its conclusion that the legislature had not in fact implemented its asserted policy, 'as witness the division of Fairfax County.' *Howell v. Mahan, supra,* 330 F.Supp. [1138] at 1140. But while Fairfax County was divided, it was not fragmented. And had it not been divided, there would have been one ten-member district in Fairfax County, a result that this Court might well have been thought to disfavor as a result of its opinion in *Connor v. Johnson,* 402 U.S. 690, 692, [91 S.Ct. 1760–1762, 29 L.Ed.2d 268] (1971). The State can scarcely be condemned for simultaneously attempting to move

toward smaller districts and to maintain the integrity of its political subdivision lines." *Mahan v. Howell, supra,* 410 U.S. at 326–327, 93 S.Ct. at 986.

The Supreme Court spoke of the "severe problems occasioned for the citizens of North Dakota during the several years of redistricting confusion." 420 U.S. at 26, 95 S.Ct. at 766. The majority of this court has again aggravated those problems[4] in pursuit of an *illusion* of equality. We are in the middle of the decade. The Legislature was confronted with the reality of the situation that there are just no accurate figures available to reflect population distribution in the State at this time, or even in 1970.[5]

The majority also recognizes the difficulty, as it seems content to utilize population figures compiled in 1975 to subdistrict cities, however declares that the 1970 census be used to determine the number of house and senate seats for each city. Not surprisingly, the Legislature came up with the very same procedure to make use of new statistics available in 1975 for certain cities in the state.

It should be noted that the appendix table to the majority opinion is based on figures which include these 1975 statistics. It seems inconsistent to use them on such a table when population figures from the 1970 census are to be used in allocating the total number of senate and house seats for each district. As noted previously, the 1975 figures are to be used only in dividing the cities into subdistricts, not for determining the number of senate and house members to which they are entitled.

The fact that the majority will recognize changes in population by 1975 for any reason is significant. The only new figures available were from a mid-decade census of several North Dakota cities. No 1975 statistics were compiled for the various rural counties which, in the majority of cases, caused the variance disparity. If the Court takes notice

---

**4.** See Legislative findings 12 and 13, supra.

**5.** See Legislative findings 15 and 16, supra.

of changes in city population, should they not also take notice of the influx of population into Pembina County because of the recent missile site construction? Or even more general, could they not attribute the increase of city population directly to a decrease in rural population?

*Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), comments on the possible effects of giving undue emphasis to gross population figures.

> "Fair and effective representation may be destroyed by gross population variations among districts, but it is apparent that such representation does not depend solely on mathematical equality among district populations. There are other relevant factors to be taken into account and other important interests that States may legitimately be mindful of. *See Mahan v. Howell, supra; Abate v. Mundt,* 403 U.S. 182, [91 S.Ct. 1904, 29 L.Ed.2d 399] (1971); *Dusch v. Davis,* 387 U.S. 112, [87 S.Ct. 1554, 18 L.Ed.2d 656] (1967); *Sailors v. Board of Education,* 387 U.S. 105, [87 S.Ct. 1549, 18 L.Ed.2d 650] (1967); *Burns v. Richardson, su-*

*pra,* 384 U.S. 73, [86 S.Ct. 1286, 16 L.Ed.2d 376]. An unrealistic overemphasis on raw population figures, a mere nose count in the districts, may submerge these other considerations and itself furnish a ready tool for ignoring factors that in day-to-day operation are important to an acceptable representation and apportionment arrangement." at 748–749, 93 S.Ct. at 2329.

Thus, while the arithmetic might be correct, there is no assurance it has any relation to the situation that actually exists. The movement of 120 persons into or out of a district would change the variance by approximately 1%.[6]

I do not construe the Legislative Plan as an attempt by the Legislature to create a precedent which would justify, in future plans, the variance which exists in the plan. It adopted the plan as the best plan to serve the people of the State of North Dakota until the 1980 census,[7] and petitioned the Congress to change census enumeration procedures so as to accurately reflect the population within minor civil division boundaries, and within "block" areas in urban centers with a population of 10,000 or more.[8]

---

**6.** The district which, under the Legislative Plan, appears to have the greatest over-representation is District 11, Pembina County. With respect to this over-representation, see Legislative findings 10 and 11, supra.

**7.** See Legislative findings 15 and 16, supra.

**8.** Senate Concurrent Resolution 4075:

"A concurrent resolution urging Congress to consider and approve legislation relating to the procedures to be utilized by the Bureau of the Census for the 1980 census.

WHEREAS, state legislative apportionment must be undertaken in conformity with the constitutionally required one-man, one-vote standard; and

WHEREAS, in conducting legislative reapportionment, states must rely on the population data prepared by the Bureau of the Census for each decennial period; and

WHEREAS, while previous standards of accuracy, timing, and geographic design were adequate for the governmental and commercial purposes of the census, such standards are not presently adequate to meet demands which have surfaced from the legislative reapportionment activities of states following the 1970 census; and

WHEREAS, census enumeration districts utilized by the Bureau of the Census for the 1970 census do not follow minor civil division boundaries; and

WHEREAS, the 1970 census was taken on a block basis only in cities of over fifty thousand in population, which does not provide smaller cities with accurate data for equitable division into legislative districts; and

WHEREAS, officials charged with the responsibility of legislative apportionment presently face difficulty in obtaining information needed to perform these duties;

NOW, THEREFORE, BE IT RESOLVED BY THE SENATE OF THE STATE OF NORTH DAKOTA, THE HOUSE OF REPRESENTATIVES CONCURRING THEREIN:

That the Forty-fourth Legislative Assembly strongly urges the United States Congress to consider and approve legislation which would require the Bureau of the Census to establish procedures in the taking of the 1980 census which would increase the amount of time available to the bureau for completion of tabulations within the time requirements of states with deadlines for redrawing legislative boundaries, to require the boundaries of census units to follow minor civil division boundaries, to

The plan must, in my opinion, be considered only on its own merits, irrespective of what has been done in the past, or in other areas.[9]

I conclude the majority has caused this Court to unnecessarily intrude upon a state legislative function, which will result in continued disruptions and distress for the citizens of North Dakota. In adherence to the doctrines of federalism, states rights and separation of powers, I am opposed to the use of the power of the federal court in this manner.

## MEMORANDUM AND ORDER

## SUPPLEMENTAL OPINION

VanSICKLE, District Judge.

This memorandum and order is supplemental to the memorandum opinion and order issued by a majority of this court on August 1, 1975, wherein, *inter alia,* Mr. Thomas K. Ostenson, as Special Master, was directed to formulate and submit a plan of reapportionment for the State of North Dakota, conforming to certain guidelines specified by the court. In addition, other interested parties were invited to submit their ideas in the form of affidavits. A hearing was held in Fargo, North Dakota, on October 22, 1975, at which time evidence was adduced. The court has now considered that evidence, together with plans submitted by Messrs. Ostenson, Donald Moore, and Richard Dobson, and all other suggestions, plans and advice submitted by affidavit. In this connection, and at this point, the court wishes to express its thanks and gratitude to the many private citizens and legislators who offered their advice in this troublesome matter. Obviously, much time and effort was expended by persons who re-

sponded to the court's invitation, and the advice and suggestions offered reflect deep, conscientious thought. These suggestions were valuable and helpful. Especially do we wish to convey our sincere thanks to Mr. Ostenson, who, as Special Master, devoted many uncompensated hours to the task assigned him and has rendered great assistance in the development of the plan of reapportionment we adopt today. We also express out gratitude to Mr. Dobson for preparing an alternative plan to which the court has given careful and favorable consideration and for assisting the court in formulating this court's plan. We thank Mr. Moore who also presented a plan of reapportionment and testified in support thereof. We also express our appreciation to counsel for all parties (including the amicus curiae) for assisting in the presentation of this material. We have drawn upon all of this material in adopting a reapportionment plan for the North Dakota Legislature. This plan, as described in this order and in Appendix A attached, is effective on the date of this filing and governs election proceedings for the state legislature to be elected in 1976 and thereafter until such plan may be duly and lawfully modified or changed.

The legislature shall consist of 50 senators and 100 representatives. The state is divided into 50 legislative districts, 48 of which shall be entitled to representation in the legislature by one senator and two representatives, and two districts (districts 40 and 50) are combined. This combined district which consists of a part of the City of Minot and the Minot Air Force Base shall be entitled to representation in the legislature by two senators and four representatives elected at large.

require block statistics for all urban areas with a population of ten thousand or more, and to encourage the bureau to cooperate with all state officials who have legislative reapportionment responsibilities; and

BE IT FURTHER RESOLVED, that copies of this resolution be forwarded by the Secretary of State to each member of the North Dakota Congressional Delegation, to the Chairman of the Subcommittee on Census and Statistics of

the U.S. House Committee on Post Office and Civil Service, and to the Director of the Bureau of the Census."

9. "[T]he fact that a 10% or 15% variation from the norm is approved in one State has little bearing on the validity of a similar variation in another State." *Swann v. Adams,* 385 U.S. 440, 445, 87 S.Ct. 569, 572, 17 L.Ed.2d 501 (1967).

This plan discloses a relatively small population deviation among the several senate districts.[1]

Based on the 1970 census figures, the ideal average population per legislative district is 12,355 and the population per district in this plan ranges from 3.16 percent above the ideal district population (district 30, population 12,745) to 3.10 percent below the state ideal (district 26, population 11,972). Thus, the deviation from the ideal totals 6.26 percent. It should be noted that only one other legislative district (district 25, + 3.09 percent, population 12,737) shows a deviation in excess of three percent from the ideal.

The court deems this deviation acceptable in a court-ordered apportionment plan, taking into account communities of interest in each of the legislative districts. We have altered most of the existing legislative districts to comply with the one man-one vote standard but we have endeavored to retain the core of existing districts in the new reapportionment plan. Thus, extreme disruption in the election processes may be avoided.

Appendix B explains the population deviations between the different legislative districts expressed in terms of the 1970 census. While we have allocated senate seats to city districts based on the 1970 census, we have divided these formerly multiple legislator urban areas into single legislative districts on the basis of the most recent census data available in these cities. The districts within each city are compared on the basis of the most recent census (Appendix C) but the allocation of legislators to each city is compared on a statewide basis in Appendix B.

As far as possible, this plan retains the district numbers used in the 1972 and 1974 elections. District number 13, a designation not utilized in these two elections, has been assigned to a district which includes West Fargo, a part of the City of Fargo, and adjacent noncity townships. District number 17 has now been assigned to the urban Grand Forks area. Numbers from 40 to 50 are assigned to legislative districts created in the largest cities of this state.

Under the plan of apportionment in effect for the 1972 state election, senators from even-numbered districts were elected to a four-year term which expires in 1976. Senators from odd-numbered districts were elected to a four-year term in 1974 and would normally serve until 1978. Accordingly, in 1976, legislative elections will be held in even-numbered districts for the office of senator for a four-year term.

Because of drastic changes in the five major urban centers, and because of district population changes resulting in other areas, in addition to those senators from even-numbered districts who will stand for election in 1976, we direct that senatorial elections shall be held in the following odd-numbered districts: 3, 5, 11, 13, 17, 19, 21, 23, 29, 33, 41, 43, 45, 47, and 49.[2]

Senators elected from these odd-numbered districts in the 1976 election shall serve for a term of two years.

Except as specifically altered by this reapportionment plan, provisions of North Dakota law shall govern the 1976 and subsequent elections to the state legislature.[3]

---

1. For comparison purposes we divide the population of the combined senate districts No. 40 and 50.

2. No new elections are deemed necessary in odd-numbered districts in which boundaries remain the same or substantially the same according to the 1970 census. The court adopts as a *de minimis* standard a population change—increase, diminution or combination of change—not to exceed 10 percent. The following odd-numbered districts are unchanged in boundaries—1, 25, 27, 37, 39. The following odd-numbered districts reflect changes of less than 10 percent in population: 7, 9, 15, 31, and 35. See Appendix D attached.

3. We attach as exhibits the following:
   1) Map of North Dakota outlining legislative districts.
   2) Maps of each of the five major cities: Fargo, Grand Forks, Minot, Bismarck, and Jamestown outlining legislative district boundaries within each city.

## APPENDIX A

### Description of Legislative Districts

Each legislative district shall be entitled to one senator and two representatives. We have combined the fortieth and fiftieth legislative districts and this combined district shall be entitled to two senators and four representatives elected at large. The legislative districts of the state shall be formed as follows:

1. The first legislative district shall consist of the City of Williston and Williston and Stony Creek townships in Williams County.

2. The second legislative district shall consist of Divide County; all of Williams County except that portion contained in the first legislative district; and Forthun, Short Creek, Keller and Fay townships in Burke County.

3. The third legislative district shall consist of Renville County and all of Ward County except those portions contained in the fifth, eighth, fortieth and forty-first legislative districts.

4. The fourth legislative district shall consist of Mountrail County and all of Burke County except that portion contained in the second legislative district.

5. The fifth legislative district shall consist of that part of the City of Minot lying south and west of a line commencing at a point where the center line of 4th Avenue Northwest intersects the west city limits, thence east on 4th Avenue Northwest until its intersection with the center line of 10th Street Northwest, thence north on 10th Street Northwest until its intersection with the center line of 4th Avenue Northwest, thence east on 4th Avenue Northwest until its intersection with the center line of North Broadway, thence south on North Broadway until its intersection with the center line of the Burlington Northern Railway right-of-way, thence north and east on the Burlington Northern Railway right-of-way until its intersection with the center line of 3rd Street, thence south on 3rd Street until its intersection with the center line of 11th Avenue Southeast, thence east on 11th Avenue Southeast until its intersection with extended 7th Street Southeast. (Other areas of the City of Minot are contained in the fortieth and forty-first legislative districts.)

6. The sixth legislative district shall consist of Bottineau County and Pratt, Deep River, Meadow, Mouse River, Willow Creek, Grilley, Little Deep, Layton, Bantry, Normal, Deering, Saline, Gilmore, Wager, Kottke Valley, Egg Creek, Riga, Denbigh, Norwich and Granville townships and the unorganized territory designated as townships 155–77, 155–78, 157–75, 157–76 and 158–76 in McHenry County.

7. The seventh legislative district shall consist of Pierce County and all of McHenry County except that portion contained in the sixth legislative district.

8. The eighth legislative district shall consist of McLean County and Hiddenwood, Ryder, Cameron, Spring Lake, Rushville, Iota Flat and Greely townships in Ward County.

9. The ninth legislative district shall consist of Rolette County and Picton, Sidney, Mount View and Armourdale townships in Towner County.

10. The tenth legislative district shall consist of Cavalier County and all of Towner County except that portion contained in the ninth legislative district.

11. The eleventh legislative district shall consist of Pembina County and Lampton, Dundee, Glenwood, Farmington, Martin and St. Andrews townships in Walsh County.

12. The twelfth legislative district shall consist of Benson and Eddy Counties.

13. The thirteenth legislative district shall consist of the Cities of West Fargo and Riverside, and Barnes and Reed townships in Cass County, and that part of the City of Fargo bound by a line

3) Map of Mercer County showing district boundary in relation to precincts. Precincts 5, 14, and 20 lie within the 36th legislative district. Precincts 13, 3, 16, and 1 lie within legislative district 33.

commencing at the point where the center line of the Burlington Northern Railway main line right-of-way intersects 12th Avenue North, thence south and east along the Burlington Northern Railway main line right-of-way until its intersection with the center line of 10th Street North, thence south on 10th Street North until its intersection with the center line of Main Avenue, thence west on Main Avenue until its intersection with the center line of 16th Street South, thence south on 16th Street South until its intersection with 5th Avenue South, thence west on 5th Avenue South until its extended center line intersects the west city limits, thence north and east, following the Fargo city limits, to the point of origin. (Other areas of the City of Fargo are contained in the twenty-first, forty-fourth, forty-fifth and forty-sixth legislative districts.)

14. The fourteenth legislative district shall consist of Wells and Foster Counties.

15. The fifteenth legislative district shall consist of all of Ramsey County except that portion contained in the twenty-third legislative district.

16. The sixteenth legislative district shall consist of all of Walsh County except those portions contained in the eleventh and nineteenth legislative districts.

17. The seventeenth legislative district shall consist of that area of land lying within the boundaries of the Grand Forks Air Force Base (such area being attached to the City of Grand Forks by that land lying within the right-of-way of U. S. Highway 2), and that part of the City of Grand Forks bound on the north by the city limits, on the east by the center line of the Red River, on the south by the center line of U. S. Highway 2 (Gateway Drive), and on the west by the city limits.

18. The eighteenth legislative district shall consist of Grand Forks township in Grand Forks County and that part of the City of Grand Forks bound on the north by the center line of U. S. Highway 2 (Gateway Drive), on the east by the center line of the Red River, on the south by the city limits, and on the west by a line commencing at the intersection of the center line of Cherry Street and the south city limits, thence north on Cherry Street until its intersection with the center line of 17th Avenue South, thence east on 17th Avenue South until its intersection with the center line of Cottonwood Street, thence north on Cottonwood Street until its intersection with the center line of 4th Avenue South, thence west on 4th Avenue South until its extended center line intersects with the center line of Washington Street, thence north on North Washington Street until its extended center line intersects with the center line of the Burlington Northern Railway right-of-way, thence north and west on the Burlington Northern Railway right-of-way until its intersection with the center line of U. S. Highway 2 (Gateway Drive). (Other areas of the City of Grand Forks are contained in the forty-second and forty-third legislative districts).

19. The nineteenth legislative district shall consist of all of Grand Forks County except those portions contained in the seventeenth, eighteenth, twentieth, forty-second and forty-third legislative districts; Sarnia, Dahlen, Michigan City, Nash and Petersburg townships in Nelson County; and Cleveland, Medford, Eden, Ops, Forest River, Ardoch and Walshville townships in Walsh County.

20. The twentieth legislative district shall consist of Traill County; Fairfield, Allendale, Walle, Union, Michigan, Americus and Bentru townships in Grand Forks County; and Hunter, Bell, Kinyon, Noble, Gunkel, Gardner and Wiser townships in Cass County.

21. The twenty-first legislative district shall consist of that part of the City of Fargo bound by a line commencing at a point where the extended center line of 9th Avenue North intersects the center line of the Red River, thence west on 9th Avenue North until its intersection with the center line of Broadway, thence south on Broadway until its intersection with the center line of the Burlington

Northern Railway right-of-way, thence west along the Burlington Northern Railway right-of-way until its intersection with the center line of 10th Street North, thence south on 10th Street North until its intersection with the center line of Main Avenue, thence west on Main Avenue until its intersection with the center line of 16th Street South, thence south along 16th Street South until its intersection with the center line of 5th Avenue South, thence west on 5th Avenue South until its extended center line intersects the west city limits, thence south along said city limits until its intersection with the center line of 13th Avenue South, thence east on 13th Avenue South until its intersection with the center line of 8th Street South, thence north on 8th Street South until its intersection with the center line of 5th Avenue South, thence east on 5th Avenue South and 6th Avenue South until its intersection with the center line of 4th Street South, thence north on 4th Street South until its intersection with the extended north property line of St. Johns Hospital, thence east along said property line until its intersection with the center line of the Red River, thence north on the Red River to the point of beginning.

22. The twenty-second legislative district shall consist of all of Cass County except those portions contained in the thirteenth, twentieth, twenty-first, forty-fourth, forty-fifth and forty-sixth legislative districts; and Sibley Trail, Baldwin, Ellsbury, Ashtabula, Grand Prairie, Minnie Lake, Getchell, Noltimier and Weimer townships in Barnes County.

23. The twenty-third legislative district shall consist of Griggs and Steele Counties; all of Nelson County except that portion contained in the nineteenth legislative district; and Nixon, Bartlett and Odessa townships in Ramsey County.

24. The twenty-fourth legislative district shall consist of all of Barnes County except those portions contained in the twenty-second and forty-eighth legislative districts.

25. The twenty-fifth legislative district shall consist of Walcott, Eagle, Colfax, Nansen, Abercrombie, Antelope, Ibsen, Dwight, Barney, Mooreton, Center, Belford, Brandenburg, Summit, Waldo, De Villo, Fairmont, Greendale and La Mars townships in Richland County.

26. The twenty-sixth legislative district shall consist of Sargent County and all of Dickey County except that portion contained in the twenty-eighth legislative district.

27. The twenty-seventh legislative district shall consist of Ransom County and all of Richland County except that portion contained in the twenty-fifth legislative district.

28. The twenty-eighth legislative district shall consist of Logan and LaMoure Counties; and Northwest, Young, Potsdam, German, Whitestone, Spring Valley, Grand Valley, Albertha, Lorraine and Elm townships in Dickey County.

29. The twenty-ninth legislative district shall consist of that part of the City of Jamestown bound on the north by the center line of the Burlington Northern Railway right-of-way, and on the east, south and west by the city limits; and Peterson, Flint, St. Paul, Chicago, Stirton (including all of the City of Cleveland), Moon Lake, Lippert, Woodbury, Homer, Winfield, Newbury, Bloomenfield, Sinclair, Cusator, Lenton, Sydney, Corwin, Ypsilanti, Streeter, Germania, Griffin, Alexander, Sharlow, Severn, Montpelier and Manns townships in Stutsman County.

30. The thirtieth legislative district shall consist of Emmons and McIntosh Counties.

31. The thirty-first legislative district shall consist of Sheridan and Kidder Counties; and all of Burleigh County except those portions contained in the thirty-second, forty-seventh and forty-ninth legislative districts.

32. The thirty-second legislative district shall consist of that part of the City of Bismarck bound on the north by the center line of the Burlington Northern Railway right-of-way commencing on the west at the center line of the Mis-

souri River, thence south and east on the Burlington Northern Railway right-of-way to its intersection with the extended center line of First Street, thence north on First Street until its intersection with the center line of Avenue B, thence east along Avenue B until its intersection with the center line of Eighteenth Street, thence south along the extended center line of Eighteenth Street until its intersection with the center line of the Burlington Northern Railway right-of-way, thence east on the Burlington Northern Railway right-of-way to the city limits, and on the east, south and west by the city limits; and the unorganized territory designated as Lincoln precinct (township 138–80) in Burleigh County. (Other areas of the City of Bismarck are contained in the forty-seventh and forty-ninth legislative districts.)

33. The thirty-third legislative district shall consist of Oliver County; all of Mercer County except that portion contained in the thirty-sixth legislative district; and all of Morton County except those portions contained in the thirty-fourth and thirty-fifth legislative districts.

34. The thirty-fourth legislative district shall consist of the City of Mandan and the unorganized territory designated as Bindewald precinct (townships 139–81 and 139–82 and that portion of township 138–82 lying north of the center line of the Heart River) in Morton County.

35. The thirty-fifth legislative district shall consist of Grant and Sioux Counties; and townships 133–82, 134–79 through 84, 135–79 through 84, 136–79 through 84, 137–79 through 87, 138–80, 138–81, that portion of 138–82 lying south of the center line of the Heart River, 138–83 through 87, and 139–83 in Morton County.

36. The thirty-sixth legislative district shall consist of McKenzie and Dunn Counties and that part of Mercer County lying west of a line commencing at a point lying on the southern boundary of Mercer County between Section 31 of Range 88 and Section 36 of Range 89,

thence north eighteen miles, thence east one mile, thence north three miles, thence west one mile, thence north two miles, thence east one mile, thence north one-half mile, thence west one mile, thence north one-half mile, thence east one-quarter mile, thence north one-half mile, thence east one mile, thence north two and one-half miles, thence west one mile, thence north two miles, thence west one mile, thence north two and one-half miles, thence west one-half mile, thence north to the northern boundary of Mercer County (precincts 5, 14 and 20).

37. The thirty-seventh legislative district shall consist of the City of Dickinson in Stark County.

38. The thirty-eighth legislative district shall consist of Hettinger and Adams Counties and all of Stark County except those portions contained in the thirty-seventh and thirty-ninth legislative districts.

39. The thirty-ninth legislative district shall consist of Golden Valley, Billings, Slope and Bowman Counties, and Slope, South Heart and Ash Coulee townships and the unorganized territory designated as townships 137–96 through 99, 138–96 through 99, 139–96, 139–99, 140–96, 140–98 and 140–99 in Stark County.

40 and 50. The fortieth and fiftieth legislative districts are combined. This combined district shall consist of that part of the City of Minot lying north of the fifth legislative district and west of the center line of North Broadway; the area of land lying within the boundaries of the Minot Air Force Base (such area being attached to the City of Minot by that land lying within the right-of-way of U. S. Highway 83); and Harrison and Burlington townships in Ward County.

41. The forty-first legislative district shall consist of that part of the City of Minot lying east of the fortieth legislative district and north and east of the fifth legislative district; and Nedrose and Surrey townships in Ward County.

42. The forty-second legislative district shall consist of that part of the City

of Grand Forks bound on the north by the center line of U. S. Highway 2 (Gateway Drive), on the east by the west boundary of the eighteenth legislative district, on the south by the center line of the Burlington Northern Railway right-of-way, and on the west by the city limits.

43. The forty-third legislative district shall consist of that part of the City of Grand Forks not made a part of any other legislative district.

44. The forty-fourth legislative district shall consist of Fargo township in Cass County, and that part of the City of Fargo bound on the east by the center line of the Red River; on the south by the twenty-first legislative district; on the west by the center line of Broadway, extending north from its intersection with the center line of 9th Avenue North to its intersection with the center line of 28th Avenue North, thence west on 28th Avenue North to the city limits; and on the north by the city limits.

45. The forty-fifth legislative district shall consist of that part of the City of Fargo bound on the north and west by the city limits; on the east by the twenty-first and forty-fourth legislative districts; and on the south by the thirteenth and twenty-first legislative districts.

46. The forty-sixth legislative district shall consist of that part of the City of Fargo lying south and east of the twenty-first legislative district.

47. The forty-seventh legislative district shall consist of that part of the City of Bismarck bound on the south by the thirty-second legislative district; on the east by a line commencing with the intersection of the center line of the Burlington Northern Railway right-of-way and the extended center line of First Street, thence north on First Street until its intersection with the center line of The Boulevard, thence east on The Boulevard until its intersection with the center line of Fourth Street, thence north on Fourth Street until its intersection with the center line of Divide Avenue, thence east on Divide Avenue until its intersection with the center line of U. S. Highway 83, thence north on U. S. Highway 83 until its intersection with the center line of Interstate Highway 94, thence east on Interstate Highway 94 to the city limits; on the north and west by the city limits; and Hay Creek township in Burleigh County.

48. The forty-eighth legislative district shall consist of that part of the City of Jamestown bound on the south by the twenty-ninth legislative district, on the east, north and west by the city limits; all of Stutsman County except that portion contained in the twenty-ninth legislative district; and Pierce, Lake Town, Dazey, Uxbridge, Edna, Rogers, Brimer, Anderson and Stewart townships in Barnes County.

49. The forty-ninth legislative district shall consist of that part of the City of Bismarck bound on the south by the thirty-second legislative district, on the west by the forty-seventh legislative district, on the north by the center line of Interstate Highway 94, and on the east by the city limits.

## APPENDIX B

Statistical Summary of Population Deviation Based on 1970 Census (ideal average population per legislative district is 12,355).

| District Number | Population | % Deviation |
|---|---|---|
| 1 | 12,170 | -1.50 |
| 2 | 12,548 | +1.56 |
| 3 | 12,535 | +1.46 |
| 4 | 12,323 | -0.26 |
| 5 | 12,238 | -0.95 |
| 6 | 12,075 | -2.27 |
| 7 | 12,721 | +2.96 |
| 8 | 12,178 | -1.43 |
| 9 | 11,994 | -2.92 |
| 10 | 12,413 | +0.47 |
| 11 | 12,626 | +2.19 |
| 12 | 12,348 | -0.06 |

13  Fargo—West Fargo and adjacent rural area districts 13, 21, 44, 45, 46 disclose a 1970 census for that area of 60,443. Dividing this census total by the five senators allocated to this area reflects a 1970 census count for each single senate district and a deviation as follows:

|  | 12,089 | -2.15 |
|---|---|---|
| 14 | 12,679 | +2.62 |
| 15 | 12,602 | +2.00 |
| 16 | 12,713 | +2.90 |

17  Grand Forks city districts 17, 18, 42, 43 disclose a 1970 census for that area of 50,005. Dividing this census total by the four senators allocated to this area reflects a 1970 census for each single senate district and a deviation as follows:

|  | 12,501 | +1.18 |
|---|---|---|

18  See district 17.

| 19 | 12,650 | +2.39 |
|---|---|---|
| 20 | 12,580 | +1.82 |

21  See district 13.

| 22 | 12,552 | +1.59 |
|---|---|---|
| 23 | 12,629 | +2.22 |
| 24 | 12,268 | -0.70 |
| 25 | 12,737 | +3.09 |
| 26 | 11,972 | -3.10 |
| 27 | 12,454 | +0.80 |
| 28 | 12,303 | -0.42 |

*  29  Jamestown, Stutsman County, and part of Barnes County in districts 29 and 48 disclose a 1970 census count of 25,080. Dividing this census total by the two senators allocated to this area reflects a 1970 census for each single senate district and a deviation as follows:

|  | 12,540 | +1.50 |
|---|---|---|
| 30 | 12,745 | +3.16 |
| 31 | 12,059 | -2.40 |

32  Bismarck districts 32, 47, and 49 disclose a 1970 census of 36,249. Dividing this census total by the three senators allocated to this area reflects a 1970 census for each single senator district and a deviation as follows:

|  | 12,083 | -2.20 |
|---|---|---|
| 33 | 12,013 | -2.77 |
| 34 | 12,023 | -2.69 |

| | | |
|---|---|---|
| 35 | 12,234 | −0.98 |
| 36 | 12,200 | −1.25 |
| 37 | 12,405 | +0.40 |
| 38 | 12,641 | +2.31 |
| 39 | 12,668 | +2.53 |
| 40 & 50 (12,228 each) | 24,456 | −1.03 |
| 41 | 12,232 | −1.00 |
| 42 | See district 17. | |
| 43 | See district 17. | |
| 44 | See district 13. | |
| 45 | See district 13. | |
| 46 | See district 13. | |
| 47 | See district 32. | |
| * 48 | See district 29. | |
| 49 | See district 32. | |

*   The census enumeration permits of allocating the 1970 enumeration
    into new districts 29 and 48 and computing the deviation on
    the basis of that census as follows:

| | | |
|---|---|---|
| 29 | 12,697 | +2.77 |
| 48 | 12,383 | +0.23 |

## APPENDIX C

Statistical Summary of Population Deviation Based on the Census Year Indicated (ideal average population per legislative district is indicated).

MINOT Districts, 1970 census, total population 48,926, ideal average population per legislative district 12,232:

| District Number | Population | % Deviation |
|---|---|---|
| 5 | 12,238 | +0.05 |
| 40 & 50 | 24,456 | |
| | (12,228) | -0.03 |
| 41 | 12,232 | 0.00 |

GRAND FORKS Districts, 1971 census, total population 52,337, ideal average population per legislative district 13,084:

| District Number | Population | % Deviation |
|---|---|---|
| 17 | 13,164 | +0.61 |
| 18 | 13,173 | +0.68 |
| 42 | 12,931 | -1.17 |
| 43 | 13,069 | -0.11 |

FARGO Districts, 1975 census, total population 64,276, ideal average population per legislative district 12,855:

| District Number | Population | % Deviation |
|---|---|---|
| 13 | 12,977 | +0.95 |
| 21 | 12,495 | -2.80 |
| 44 | 12,907 | +0.40 |
| 45 | 12,942 | +0.68 |
| 46 | 12,955 | +0.78 |

JAMESTOWN Districts, 1971 census, total population 24,991, ideal average population per legislative district 12,496:

| District Number | Population | % Deviation |
|---|---|---|
| 29 | 12,529 | +0.26 |
| 48 | 12,462 | -0.27 |

BISMARCK Districts, 1975 census, total population 40,527, ideal average population per legislative district 13,509:

| District Number | Population | % Deviation |
|---|---|---|
| 32 | 13,703 | +1.44 |
| 47 | 13,445 | -0.47 |
| 49 | 13,379 | -0.96 |

APPENDIX D

Population Changes in Odd-Numbered Legislative Districts Outside Major Cities

| New Number | Old Number | Old Pop. | Loss | Gain | New Pop. | % Loss | % Gain | Total % Change |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 12,170 | 0 | 0 | 12,170 | 0 | 0 | 0 |
| 3 | 3 | 12,397 | 927 | 1065 | 12,535 | 7.5 | 8.6 | 16.1 |
| 7 | 7 | 12,838 | 117 | 0 | 12,721 | 0.9 | 0 | 0.9 |
| 9 | 9 | 11,549 | 0 | 445 | 11,994 | 0 | 3.9 | 3.9 |
| 11 | 11 | 10,728 | 0 | 1898 | 12,626 | 0 | 17.7 | 17.7 |
| 15 | 15 | 12,915 | 313 | 0 | 12,602 | 2.4 | 0 | 2.4 |
| 19 | 19 | 11,097 | 1480 | 3033 | 12,650 | 13.3 | 27.3 | 40.6 |
| 23 | 23 | 10,945 | 3012 | 4696 | 12,629 | 27.5 | 42.9 | 70.4 |
| 25 | 25 | 12,737 | 0 | 0 | 12,737 | 0 | 0 | 0 |
| 27 | 27 | 12,454 | 0 | 0 | 12,454 | 0 | 0 | 0 |
| 31 | 31 | 11,843 | 0 | 216 | 12,059 | 0 | 1.8 | 1.8 |
| 33 | 33 | 12,633 | 1178 | 557 | 12,013 | 9.3 | 4.4 | 13.7 |
| 35 | 35 | 12,130 | 333 | 437 | 12,234 | 2.7 | 3.6 | 6.3 |
| 37 | 37 | 12,405 | 0 | 0 | 12,405 | 0 | 0 | 0 |
| 39 | 39 | 12,668 | 0 | 0 | 12,648 | 0 | 0 | 0 |

EXHIBIT 1

NORTH DAKOTA
COUNTIES, TOWNSHIPS, AND CITIES

EXHIBIT 2a

EAST GRAND FORKS
Population: 7,555

GRAND FORKS
Population: 39,008

**locations of:**

A – Armory Auditorium – headquarters
B – University Center
C – Chester Fritz Auditorium
D – KOA Campground
E – Lincoln Park Golf Course
F – Country Club Golf Course
G – Turtle River State Park (20 miles west of GF)
H – Ambassador Motel, 2021 South Washington
I – Bel-Mar, Larimore, ND (25 miles west of GF)
J – Dacotah Motor Hotel, 106 N 3rd Street
K – Frontier Motel, 618 South Washington
L – Holiday Inn, Highway 2 & Interstate 29
M – Holly Inn Motel, 1111 South Washington
N – Lucky Inn Motel, 1403 South Washington
O – North Star Inn, 2100 South Washington
P – Plainsman Motel, 2201 Gateway Drive
Q – Plaza Motel, East Grand Forks, Mn.
R – Ramada Inn, Highway 2 & Interstate 29
S – Royal Motor Court, 1301 South Washington
T – Ryan Motor Hotel. 23 North 3rd Street
U – Westward Ho Motel, Highway 2 West

JAMESTOWN

HECTOR AIRPORT

**FARGO**

**MOORHEAD**

BISMARCK

OLD WEST TRAIL
CITY CIRCLE TOUR

① CAPITOL
Free conducted tours ever y hour on
business hours.
② STATE HISTORICAL MUSEUM —
Monday through Friday — 8 a.m. to 5 p.m.
Saturday — 9:30 a.m. to 4:30 p.m.
Sunday (June through Aug.) — 1
③ CAMP HANCOCK

Missouri River

EXHIBIT 2e

EXHIBIT 3

MERCER
COUNTY HIGHWAY MAP
NORTH DAKOTA
— 1962 —

1972 VOTING PRECINCTS

PRECINCT #.......... 1
"      #.......... 3
"      #.......... 5
"      #.......... 13
"      #.......... 14
"      #.......... 16
"      #.......... 20
"      # Stanton City
"      # Hazen City No 1
"      # Hazen City No 2
"      # Beulah City No 1
"      # Beulah City No 2
"      # Zap City
"      # Golden Valley City
"      # Pick City City

Precinct # 1 ———— Hans Wuerth
Precinct # 3 ———— Henry Reichenberg
"       # 5 ———— Anna Funk
"       # 13 ———— Joe Sebastian
"       # 14 ———— Ruby Dellman
"       # 16 ———— Clarence Sailer

BENSON, Chief Judge (concurring specially).

Except for the plan of the Legislature, the reapportionment plan now ordered by the Court is the least disruptive of the plans considered. I have not abandoned my dissent to the decision of the Court holding the Legislature's plan to be constitutionally defective, but because it is in the public interest to get this matter resolved, I have signed the order.

I wish to point out that the arithmetic of the plan shows a maximum deviation of 6.26% based on the 1970 census figures. Because census data later than the 1970 census was used in forming the districts in the cities of Fargo, Grand Forks, Bismarck and Jamestown, the actual deviation appears to be closer to 14%. This is significant only because it again demonstrates the difficulty of achieving mathematical equality and the wisdom of the Supreme Court's comments in *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), quoted in my dissent, that fair and effective representation does not depend solely on mathematical equality among district populations.