Curtis GRAVES et al.

v.

Ben BARNES et al.

Diana REGESTER et al.

v.

Bob BULLOCK et al.

Johnny MARRIOTT et al.

v.

Preston SMITH, et al.

Van Henry ARCHER

v.

Preston SMITH et al.

Frank A. ESCALANTE et al.

v.

Mark WHITE et al.

James GASKIN et al.

v.

Mark WHITE et al.

Wanda L. CHAPMAN et al.

v.

Mark W. WHITE, Jr., et al.

Civ. A. Nos. A–71–CA–142 to A–71–CA–145, A–73–CA–115, A–73–CA–146 and A–73–CA–155.

United States District Court,
W. D. Texas,
Austin Division.

Oct. 31, 1977.

Don C. Gladden, Fort Worth, Tex., for plaintiffs.

R. Steve Bickerstaff, Jr., Asst. Atty. Gen., Austin, Tex., for defendants.

Before GOLDBERG, Circuit Judge, and JUSTICE and WOOD, District Judges.

MEMORANDUM OPINION

PER CURIAM.

Because our selection of the current districting plan [1] for Tarrant County, Texas, in 1976 was guided in no small way by constraints of time and practicability,[2] we expressly retained jurisdiction to grant further relief if the plan proved inadequate to relieve the constitutional deprivations suffered by the minority communities of Tarrant County.[3] In response to the plaintiffs' motion, we made good our promise to reconvene and reconsider the propriety of the legislative districting plan adopted for the county, by convening a hearing of two days duration in September of 1977. We are now graced with a less coercive timetable and a somewhat fuller record upon which to consider the current status of the minorities in Tarrant County. Our earlier ruling was admittedly wrought of practicality; we now determine whether it may stand as a matter of principle.

1. See *Graves v. Barnes (Graves III)*, 408 F.Supp. 1050 (W.D.Tex.1976) (3-judge court). Reference to this earlier opinion will reflect, in pertinent part, the history of this protracted litigation. *See also, Graves v. Barnes (Graves I)*, 343 F.Supp. 704 (W.D.Tex.1972); *Graves v. Barnes (Graves II)*, 378 F.Supp. 640 (W.D.Tex. 1973).

2. *Graves v. Barnes (Graves III), supra* n. 1, 408 F.Supp. at 1054.

3. Those findings regarding the existence and extent of racial discrimination and dilution of minority access to the political process appear in (*Graves II*), *supra* n. 1, 378 F.Supp. at 644–48.

\* \* \* \* \* \*

Two substantive challenges are brought against the current districting plan for Tarrant County. First, it is claimed that the plan unconstitutionally dilutes the voting strength of the county's minority community and thereby denies minorities equal access to the electoral process. Over-saturation of minorities in one district, accompanied by a fragmentation and dispersal of the remaining minorities among other districts, allegedly accomplishes this dilution.

On a second, and essentially independent front,[4] the present plan is claimed to violate the Fourteenth Amendment's equal protection requirement that legislative districts be "as nearly of equal population as is practicable." *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506, 536 (1963); *Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); *Conner v. Finch,* 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977). Proof here partakes of a comparison between the plaintiffs' plan, with an absolute population deviation of less than 2%, and the plan now in effect, with a deviation factor of 7.7%.

 Our consideration of these vexed questions is diverted by a preliminary issue regarding the scope of our review. Specifically, we are bound to determine whether the present plan is one deserving of indulgent review, by virtue of its purportedly legislative genesis,[5] or whether it must be held to those higher standards which pertain to districting plans that are the product of court order.[6] This, in turn, requires

examination of "the thorny questions concerning the extent to which one plan might be deserving of some presumptive preference on the basis of its closer congruence to the legislatively drawn lines of H.B.1097 [citations omitted]." *Graves v. Barnes,* 408 F.Supp. 1050, 1054 n. 8 (W.D.Tex.1976). Also, because our earlier observation that neither plan enjoys legislative approval may no longer be precisely accurate, we must evaluate such legislative imprimatur as the current plan may carry.

That the provisions of House Bill 1097 are presently ineffective as law is beyond dispute.[7] Nevertheless, the defendants urge preference to their plan, emphasizing that it retains three districts unchanged from those drawn in House Bill 1097, and makes only minor changes in others.[8] This once-removed approximation of legislative intent is claimed to cloak the present plan with the mantle of state policy, thereby to lend it a preferred status over the plaintiffs' proposal.

Although it is an unlikely argument—to proclaim as virtue a kinship with that which was riddled with vice—we of course recognize our duty to respect state apportionment policy. *See, e. g., White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). We perceive the similarity of this matter with the facts of *White v. Weiser, supra,* and, even as the district court there was required to give deference to state policy appearing in an unconstitutional legislative proposal, we correspondingly stand ready to honor such policy considerations as do not

---

4. Our courts have acknowledged the occasional incompatibility of the two types of claims pursued here. Thus, it is said that ". . . redistricting done to comply with one-man, one-vote requirements may impinge upon the right of members of minorities to legal access to the processes of democracy." *Kirksey v. Board of Supervisors of Hinds County, Mississippi,* 554 F.2d 139 (5th Cir. 1977) (*en banc*).

5. Regarding the short and unhappy life of the Texas Legislature's last redistricting effort, as

embodied in House Bill 1097, *see (Graves III), supra* n. 1, 408 F.Supp. at 1051–52.

6. *See generally Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975).

7. *See* note 5, *supra.*

8. Pre-trial Order Stipulation No. 20.

detract from Constitutional requirements. *Id.,* at 795, 93 S.Ct. at 2354–55, 37 L.Ed.2d at 346. We expressly eschew any notion, however, that the present plan deserves that kind of deference that properly attaches to conventional apportionment legislation. The last redistricting proposal which might have laid claim to such preferential treatment was House Bill 1097; along with its rejection by the U. S. Attorney General went any legitimate basis for this court's relaxed scrutiny of the so-called "state" proposal.[9] It is, therefore, only to the extent that the present plan *demonstrates* a legitimate state policy that it enjoys that privileged review which might have been presumptively accorded its predecessor.

■ Since our adoption of the present plan in 1976, the Texas Legislature has convened and adjourned both a Regular and a Special Session. Although neither session produced any bill relating to legislative reapportionment in Texas,[10] it is suggested by the defendants that a product of the Special Session lends some form of legislative sanction to the present plan. Specifically, it is argued that the passage of two Resolutions, one by the Texas House of Representatives,[11] and one by the Texas Senate,[12] demonstrates legislative approval of the current districting scheme. This occurrence, we are told, should weigh in favor of our continuing approval of the present districting plan.

We pretermit an extended discussion of these legislative Resolutions, since their in-firmities are obvious. We recognize, of course, that "reapportionment is a complicated process," and that "[d]istricting has sharp political impact and inevitably political decisions must be made by those charged with the task." *White v. Weiser, supra,* 412 U.S. at 795–96, 93 S.Ct. at 2355, 37 L.Ed.2d at 346. It is for that reason, certainly, that "reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." *Chapman v. Meier, supra,* 420 U.S. at 27, 95 S.Ct. at 766, 42 L.Ed.2d at 785. But to suggest that the mere endorsement of the plan adopted by this court in any way meets the task that properly befalls the legislature is to subvert totally the logic of our traditional deference to legislative effort. That deference contemplates a studied and thoughtful approach to the process of legislative apportionment, whereby the resulting legislation may be presumed to embody the legitimate concerns of the general public. It plainly does not envision such an abnegation of the legislative function as is suggested here; so attenuated a claim to the common will can be accorded only limited solicitude.[13]

Regarding the claim of voting dilution in Tarrant County, our previous comparison of the same two plans that are now before us led us to the following conclusion:

> The 1970 census data supplied to the court, as well as the testimony adduced at the recent hearing in this suit, does not demonstrate that either of the two plans is unconstitutional. Both plans provide

---

**9.** That we do not here confront a true legislative plan was admitted by counsel for the State of Texas in our previous hearing:
> Ms. Levatino: It is the State's opinion, as the Judges have pointed out here, that surely [the proposed plan] is not a legislative plan. It is a plan proposed by the State which we believe we have a duty to do.

Transcript of 1976 hearing at 163.

**10.** Pre-trial Order, Stipulations Nos. 5 and 6.

**11.** House Simple Resolution, First Called Session, 65th Legislature. The full text of this resolution appears in our Appendix.

**12.** Senate Resolution No. 2, First Called Session, 65th Legislature. The text of this resolution is identical to that adopted by the House of Representatives.

**13.** Certainly we are not much comforted by the extent of deliberation which appears to have accompanied these measures. The record suggests, for example, that the attention given House Simple Resolution No. 2 consumed no more than one or two hours.

for a primary district in which minority voters constitute a clear majority. In the Escalante Plan, this district is 49.3% black and 22.2% Mexican American, while the defendants' primary district is 60.2% black and 3.8% Mexican American. In addition, each plan contains a secondary district with approximately 43% minority population. In the plaintiffs' plan, this district is 38.9% black and 3.6% Mexican American, while the defendants' equivalent district is 25.3% black and 18.2% Mexican American. An examination of each plan's tertiary and quartary minority districts adds little flesh to the bones of the foregoing observations. Each of the proposed plans represents a substantial improvement over the former multimember scheme with its attendant constitutional infirmities.

*Graves v. Barnes (Graves III), supra,* 408 F.Supp. at 1052–53.

Barring any new evidence on the issue of minority access, we are bound to our holding that the present plan is a constitutional one. Since that earlier writing, however, the 1976 election for members of the Texas House of Representatives was accomplished under the provisions of the present plan. According to plaintiffs, the result of that election provides new evidence of the dilution of minority access to the political process in Tarrant County. Further, the plaintiffs assert the validity of a population survey prepared at their instance and introduced at trial.[14] The survey is claimed to show a changing demographic pattern in the primary minority district (District 32–H), which was created under the present districting scheme. This pattern of change purportedly results in an enhancement of minority population in District 32–H, culminating in an oversaturation there, and a concomitant fragmentation of minority influence in the secondary and tertiary minority districts. In due course, we shall turn to a consideration of the plaintiffs' new evidence; but our immediate concern is with the legal background against which the plaintiffs' proof must be viewed.

In order to sustain a claim of denial of minority access to the political process, [t]he plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.

*White v. Regester,* 412 U.S. 755, 765–66, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314, 324 (1973). The Court of Appeals for the Fifth Circuit has recently emphasized those particular elements which the Supreme Court, in *White v. Regester,* had identified as probative of denial of access to the political process.

Among these are: a history of official racial discrimination which touches the right of the minority to register and vote and to participate in the democratic process, 412 U.S. at 766, 93 S.Ct. 2332, 37 L.Ed.2d at 325; a historical pattern of a disproportionately low number of minority group members being elected to the legislative body, *id.;* a lack of responsiveness on the part of elected officials to the needs of the minority community, 412 U.S. at 769, 93 S.Ct. 2332, 37 L.Ed.2d at 325–26; a depressed socioeconomic status which makes participation in community processes difficult, 412 U.S. at 768, 93 S.Ct. 2332, 37 L.Ed.2d at 325–26; and rules requiring a majority vote as a prerequisite to nomination, 412 U.S. at 766, 93 S.Ct. 2332, 37 L.Ed.2d at 324. While these standards were developed for use in situations involving multimember districts, they have equal application to redistricting schemes making use of single-member districts, such as the plan presently before this court. *Robinson v.*

---

**14.** Plaintiffs' Exhibit No. 2–77.

*Commissioners Court,* 505 F.2d 674, at 678 (CA5, 1976);

*Kirksey v. Board of Supervisors of Hinds County, Mississippi, supra,* 554 F.2d 139,143 (5th Cir. 1977) *(en banc).*

The *Kirksey* court also acknowledged the Supreme Court's new emphasis upon "the interplay, in equal protection cases, between racially discriminatory intent and racially differential impact as criteria for violation of the equal protection clause." *Id.* at 147. Citing *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *assuming* their applicability to racial minorities' claims of exclusion from the democratic process, *Kirksey, supra,* at 147, the *en banc* panel nevertheless observed that "nothing in these cases suggests that, where purposeful and intentional discrimination already exists, it can be constitutionally perpetuated into the future by neutral official action." *Id.,* at 148. Accordingly, the *Kirksey* court concluded that "[w]here a [districting] plan, though itself racially neutral, carries forward intentional and purposeful discriminatory denial of access that is already in effect, it is not constitutional." *Id.,* at 146.

It is proposed by no one that we re-open our inquiry regarding the political and racial history of Tarrant County under its previous multi-member plan. We therefore adhere to our earlier finding that that plan worked "unconstitutionally to 'cancel and minimize' minority voting strength according to the standards in *White v. Regester, supra, Zimmer v. McKeithen, supra,* [485 F.2d 1297 (5th Cir.)] and *Turner v. McKeithen, supra* [490 F.2d 191 (5th Cir.)]." *Graves v. Barnes (Graves II)* 378 F.Supp. 640, 648. Our present inquiry is whether the current plan, effectuated in 1976, per-

petuated an existent denial of access by the racial minority to the political process. *Kirksey, supra,* 554 F.2d at 143. It is in this limited context, and in the light of the *Kirksey* decision, that we consider plaintiffs' claimed new evidence of dilution.

As already mentioned, the Primary and General Elections of 1976 were carried out under the plan now in effect for Tarrant County. Five persons, all black, filed for the Democratic nomination for State Representative in the primary minority district, 32–H. No filing was made for the Republican nomination. Candidates Leonard Briscoe and Bobby Webber obtained run-off positions against the three other blacks. Briscoe was subsequently certified as the Democratic nominee, and was later elected as the State Representative of District 32–H.[15]

In District 32–F, the secondary minority district, the incumbent Anglo, Doyle Willis, was the only person to file for the Democratic nomination. There was no filing for the Republican nomination, and Willis was duly elected State Representative from District 32–H.[16] The tertiary minority district, 32–I, elected as its Representative an Anglo, Ms. Chris Miller. These election results, and in particular their perceived meaning by the minority community, bear close scrutiny.

The election of a black representative from District 32–H, with a minority population of sixty-five percent, was a predictable result of the present districting scheme. No longer can it be said, as was true in 1974, that few blacks had ever sought, and none had ever won, a legislative seat from Tarrant County District 32. *Graves v. Barnes (Graves II), supra,* 378 F.Supp. at 645. Nor could it today be said—if numerical proportionality were our sole concern—that minority access in Tarrant County is still at its arithmetical nadir. But we cannot be satisfied with this measure alone.

---

15. Pre-trial Order, Stipulation Nos. 8, 10, and 19.

16. Pre-trial Order, Stipulation No. 9.

Were we to hold that a minority candidate's success at the polls is conclusive proof of a minority group's access to the political process, we would merely be inviting attempts to circumvent the Constitution. This we choose not to do. Instead, we shall continue to require an independent consideration of the record.

*Kirksey v. Board of Supervisors of Hinds County, Mississippi, supra,* 554 F.2d at 149 n.21.

So far as the record before us pertains to the totality of representation accorded the minority community, and to the extent that the perceived responsiveness of elected representatives may offer some index of minority access to the decision-making process, *see, e. g., Zimmer v. McKeithen, supra,* 485 F.2d at 1305, we can only conclude that the minority interests of Tarrant County today enjoy an equal opportunity "to participate in the political processes and to elect legislators of their choice." *White v. Regester, supra,* 412 U.S. at 766, 93 S.Ct. at 2339, 37 L.Ed.2d at 324. Just as we do not overestimate, the significance of the election of a black representative, we also appreciate the possibility that minority interests may be fostered by representatives who are of non-minority status. Indeed, the record before us demonstrates that effective representation is not a function of ethnicity alone.

In District 32–F, with a minority population of approximately forty-four percent, Representative Willis ran unopposed in both the Democratic primary and the 1976 general election. In three prior elections, when he was twice opposed by black Republican candidates, and once by a black Democratic candidate, Representative Willis carried the

black precinct of Tarrant County by considerable majorities.[17] These results evidence Representative Willis' continuing support in the minority community. Even more probative, we believe, is the generally favorable review of Representative Willis' performance by the plaintiffs' own witnesses.[18]

No less enthusiastic was the testimony in support of Representative Miller, whose District 32–I embraces a 15.32% minority population.[19] It was Miller who, in 1975, introduced the plaintiffs' plan as a redistricting measure in the Texas Legislature.[20] We further note that Miller's election in 1976 was in part attributable to the strong support of the minority precincts in District 32–I.[21] Upon these facts, we can only conclude that the present plan operates effectively to remedy the pre-existent denial of access by the racial minority to the political process in Tarrant County. We perceive no basis in the results of the 1976 election to question our earlier finding that the current districting plan is not constitutionally infirm.

Our belief that the plan is not racially discriminatory survives also the report prepared by Dr. Tom Marshall and tendered in evidence by the plaintiffs. The effect of Dr. Marshall's report, if accurate, is to show that, since 1970, a movement of black population into previously all-white areas of southeastern Fort Worth has occurred, with the result that the minority population of District 32–H has climbed far above the sixty-five percent figure shown by the 1970 census.[22] This claimed oversaturation of minorities in District 32–H provides, of course, the basis for the plaintiffs' claim of fragmentation and voting dilution

---

**17.** Transcript of 1977 hearing at 371. These results are said to be explained, in part, by the black voters' disaffection from the Republican Party, and by the general perception that Willis' Democratic opponent was of unstable mental capacity. *Id.*

**18.** Transcript of 1977 hearing at 355, 485.

**19.** Transcript of 1977 hearing at 485, 533.

**20.** Transcript of 1977.hearing at 687.

**21.** Transcript of 1977 hearing at 657.

**22.** Transcript of 1977 hearing at 430. According to the Marshall Report, the present minority population figure is in the area of 82%.

in the remaining minority districts, 32–F and 32–I.

Were we to accept as accurate the proposed revision of population figures for District 32–H, we might still be hard put to conclude that the existing plan accounts for a denial of minority access. "[C]learly it is not enough to prove mere disparity between the number of minority residents and the number of minority representatives." *Kirksey, supra,* at 143, citing *Zimmer v. McKeithen,* 485 F.2d 1297 at 1305 (5th Cir. 1973) (*en banc*), aff'd on other grounds sub nom. *East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). Nor have we yet reached the position where minority votes may be said to be diluted merely because their effect is not maximized. *See City of Richmond v. United States,* 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975).

But it is for a different, and more fundamental reason that we are unable to accord significance to this element of the plaintiffs' new proof. Our examination of the Marshall study persuades us that its projections simply do not offer that "high degree of accuracy" required to supplant the population figures of the prior decennial census. *Kirkpatrick v. Preisler,* 394 U.S. 526, 535, 89 S.Ct. 1225, 1231, 22 L.Ed.2d 519, 527 (1969); *see also, Dixon v. Hassler,* 412 F.Supp. 1036 (W.D.Tenn.1976), aff'd sub nom. *Republican Party of Sheldon County, Tennessee v. Dixon,* 429 U.S. 934, 97 S.Ct. 346, 50 L.Ed.2d 303 (1974). Among the several scientific defects from which the report is said to suffer,[23] we note in particular the incongruity of combining 1970 total population figures with 1977 data on ethnic composition. In our view, the resulting calculation of ethnic ratio changes is necessarily skewed; certainly the product is not the "careful and substantial demographic analysis" upon which we might question the current legitimacy of the 1970 census figures. *Graves v.*

*Barnes (Graves III), supra,* 408 F.Supp. at 1053. We are therefore constrained to find that the present plan is a constitutional one, in the sense that it does not perpetuate a pre-existent denial of minority access to the political process. *Kirksey, supra.*

\* \* \* \* \* \*

When the present plan was implemented, in 1976, we reserved the question "[w]hether the 7.7% deviation in the defendant's plan is objectional [sic] under the *Chapman* standard . . ." *Graves v. Barnes (Graves III), supra,* 408 F.Supp. at 1053. In *Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975), to which we referred, the following language appears:

> We hold today that unless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature must avoid use of multimember districts, and, as well, must ordinarily achieve the goal of population equality with little more than *de minimis* variation. Where important and significant state considerations rationally mandate departure from these standards, it is the reapportioning court's responsibility to articulate precisely why a plan of single member districts with minimal population variance cannot be adopted.

*Id.,* 420 U.S. at 26, 95 S.Ct. at 766, 42 L.Ed.2d at 784.

We found in the exigencies of time sufficient justification for the higher deviation in the state's plan, *Graves v. Barnes (Graves III), supra,* 408 F.Supp. at 1053, and we therefore postponed to another day "[t]he troublesome question . . . whether *Chapman* significantly modifies the *Mahan* [*v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320] standard [for legislatively-crafted plans] in relation to court-ordered plans." *Id.,* n.7. The day of reckoning having arrived, we now contemplate the issue of population deviation.

---

**23.** *See, generally,* Transcript of 1977 hearing at 586–92, testimony of Dr. Del Taeble; *see also*

Transcript of 1977 hearing at 1204, deposition of Dr. Dudley L. Poston, Jr.

■ The equal protection clause requires that legislative districts be of nearly equal population, so that each person's vote may be given equal weight in the election of representatives. *Reynolds v. Sims, supra.* Minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination so as to require justification. *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). In the case of *legislatively* enacted plans, that rule accounts for a threshold of approximately ten percent, below which maximum population deviations are deemed to be of prima facie constitutional validity. *Id.; White v. Regester, supra.* The precise *de minimis* threshold for *court-ordered* plans is less certain, but is plainly lower than that afforded legislative apportionments. *Chapman v. Meier, supra.* In the process of giving strict scrutiny to a court-ordered plan, the Supreme Court has refused to assume the validity of even a 5.9% deviation. *Id.; accord, Conner v. Finch, supra,* 431 U.S. at 418, n.17, 97 S.Ct. at 1835, 52 L.Ed.2d at 476.

In its most recent writing on the topic of legislative apportionment, *Conner v. Finch, supra,* the Supreme Court held that a Mississippi District Court abused its equitable discretion in fashioning a reapportionment plan which resulted in absolute population deviations of 16.5% in Senate districts and 19.3% in House districts. To be sure, these aggravated population disparities would have offended even the guidelines for legislatively-crafted apportionments, and therefore tell us little about the current status of the *de minimis* rule as a purely mathematical proposition. But the new guidance we gain *from Conner* is that considerations of state policy that result in a statistically offensive plan "cannot be viewed as controlling and persuasive when other, less statistically offensive, plans already devised are feasible [citations omitted]." *Conner, supra,* 431 U.S. at 420, 97 S.Ct. at 1836, 52 L.Ed.2d at 477. Confronted, as we are, with two proposals of measurably different deviation, we proceed under the Court's new relativist approach, and compare the efficacy of each in accomplishing legitimate state policy. Even assuming that the population deviation here approaches, if it does not occupy, the borderline of judicially proscribed deviations, we are propelled onto the road of equitable discretion.

■ One of the state policies purportedly served by the configuration of the districts in the present plan is the maintenance of the integrity of political subdivision lines. That the preservation of such boundaries is a legitimate state goal we readily acknowledge. *Mahan v. Howell,* 410 U.S. 315, 329, 93 S.Ct. 979, 987, 35 L.Ed.2d 320, 333 (1973); *Swann v. Adams,* 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967). We are, however, considerably less certain that this policy is better accomplished in the present than the proposed plan. The record indicates that the present plan transcends city boundaries no less than thirty-four times, carving Haltom City into three districts, and Arlington into four. The plaintiffs' plan interrupts city boundaries slightly *fewer* times.[24] If there exists a state policy of respecting political boundaries, it is certainly no better served by the present plan than by that which is proposed in its stead.

■ A second policy said to be served under the present plan is maintaining identifiable communities of interest. This, too, we believe to be a legitimate state goal, *see, e. g., Chapman v. Meier, supra,* although, in the instant case, it is far from apparent that the alleged communities of interest account for the higher absolute deviation inherent in the. state's plan. So far as the record offers any guidance here—and it does not offer much—we observe no basis for concluding that the present plan is superior to the proposed one. Instead, we find utterly conflicting evidence regarding even those interests which may be said to be

---

**24.** Transcript of 1977 hearing at 464–65.

communal. For example, a resolution passed by the City Council of Arlington entreats this court to approve the present plan for its recognition of the common interest of the City of Arlington and contiguous cities. This, in the face of a districting scheme that parcels the City of Arlington into four separate districts. If there is policy at work here, we fail to perceive it.

We are troubled, too, by the rather loose and ill-defined characterization of community interest that supposedly underlay House Bill 1097, and, by reference, the current plan. The footnoted colloquy between plaintiffs' counsel and Representative Tom Schieffer, author of the current plan, is illustrative.[25]

We do not find in the record the slightest suggestion of those interests, other than geography, which might join these "communities". Indeed, we might as readily observe that the commonality of interest among these regions goes no further than their placement within the same legislative district. Without more than this conclusory claim to legislative intent, we are not persuaded that this element of state policy in any way palliates a population variance of 7.7%.

 The creation of compact representative districts constitutes a legitimate state objective. That the present plan more closely approximates this goal is evident.[26] But it is equally apparent that the record contains no evidence that the plan's higher deviation factor is the result of an effort at compaction. We understand the law of reapportionment to permit a trade-off between the competing aims of state policy and population equality. Where legitimate state policy can be accomplished only at the expense of population equality, then an otherwise intolerable degree of deviation may become acceptable. But it is not enough to demonstrate merely that a plan of higher deviation *may happen* to accomplish certain policy goals; rather, the burden upon the proponent of such a plan is "to articulate clearly the relationship between the variance and the state policy furthered." *Chapman, supra,* 420 U.S. at 24, 95 S.Ct. at 764, 42 L.Ed.2d at 783.[27]

 It is this fundamental failure of proof, under both *Chapman* and *Conner*, which vitiates the defendants' other state policy claims as well. We accept the proposition that the maintenance of existing member-constituent relationships is a justifiable state policy, *see White v. Weiser, supra,* 412 U.S. at 791, 93 S.Ct. at 2352–2353, 37 L.Ed.2d at 343–344, and that it is well-served under the present plan. But we

---

**25.** Q. Now, then, communities of interest, would you tell the Court what communities of interest were preserved under your plan that existed in 1097?
A. Well, I think in—obviously, in Districts A, B, C and D the communities of interest were preserved in toto.
Q. Can you tell me what they are?
A. Well, in A it was to provide a district, growth district in Hurst, Euless, Bedford and around in there.
B was to give the City of Arlington a representative.
C was to give a district to the south side, lower south side.
D was to give the west side of Fort Worth a representative.
In District E, what is District E, that had been primarily a rural suburban district made up of small communities, and I think that that was the primary consideration in drawing it, and in the revised plan it was made even more so because I think only one tract of the City of Fort Worth exists in E.
In E, F [sic], H and I, the core districts, I think under the compromise were—were made in almost all the City of Fort Worth representing the inner city.
In G, that's the east side of Fort Worth and the west side of Arlington. I think—I can't remember whether it was Richland Hills or North Richland Hills, that area above Fort Worth.
Transcript of 1977 hearing, at 836–37.

**26.** Defendants' Exhibit Y.

**27.** It is on this element of proof that the existence of a less statistically offensive plan is so probative. Plainly, the existence of an alternative plan that is as efficacious in state policy terms, and less offensive in terms of deviation, destroys any claim that the furtherance of state policy *necessitates* the higher deviation.

do not understand that this goal can be accomplished only at the expense of so high a deviation from the population norm. This element of state policy has not been, under *Chapman,* "explicitly shown to necessitate the substantial deviation embraced by the plan." *Chapman v. Meier, supra,* 420 U.S. at 24, 95 S.Ct. at 765, 42 L.Ed.2d at 783. We therefore cannot endorse a plan that accomplishes, however fully, this limited objective. *See Robinson v. Commissioners Court, Anderson County,* 505 F.2d 674, 680 (5th Cir. 1974).[28]

 Finally, we are urged, both as a matter of policy and equity, to consider that continued adherence to the present plan will have the effect of avoiding voter confusion and encouraging voter participation. Another change in the districting of Tarrant County, it is claimed, will work a disruption upon the election process, and will operate to the substantial inconvenience of those county officials responsible for implementing any electoral changes. With all of these assertions we cannot disagree. But we do not conclude that these arguments demonstrate the merits of one proposal over the other; they suggest, instead, the same pragmatic rationale for decision that permitted only provisional relief once before.

It will ultimately serve no one for us to ignore constitutional norms in the name of convenience and administrative inertia. "[A] District Court should not, in the name of state policy, refrain from providing remedies fully adequate to redress constitutional violations which have been adjudicated and must be rectified." *White v. Weiser, supra,* 412 U.S. at 797, 93 S.Ct. at 2355, 37 L.Ed.2d at 347. Our conclusion today is that the present scheme of districting in Tarrant County produces greater population disparities than necessary to effectuate

any coherent and legitimate state policy. We accordingly adopt that plan which is, if at all, only marginally less effective in implementing identifiable state interests, and which comes significantly closer to achieving the goal of equal apportionment. This result we believe to be obligatory, both as a matter of constitutional principle, and as the product of the exercise of our equitable discretion. We therefore find that the plaintiffs' proposed plan for legislative redistricting in Tarrant County District 32 should be put into effect.

It will be so ORDERED.

JOHN H. WOOD, Jr., District Judge, dissents.

## APPENDIX

### RESOLUTION

WHEREAS, The 64th Legislature, in Chapter 727, Acts of the 64th Legislature, 1975, established single-member legislative districts for District 32 in Tarrant County; and

WHEREAS, On February 19, 1976, the United States District Court for the Western District of Texas entered an order reapportioning those single-member legislative districts in Tarrant County encompassed by Districts 32A through 32I of Chapter 727, Acts of the 64th Legislature, 1975; and

WHEREAS, That order has been in effect since the date of issuance and the 1976 elections were conducted in accordance with that plan, in which elections one Black and one Republican were elected to represent two of those districts; and

WHEREAS, The election of these representatives indicates that the plan embodied

---

**28.** We do not ignore the defendants' suggestion that, by virtue of a single shift in census tracts, the population variance might be reduced to 5.8%. Transcript of 1977 Hearing at 671; Defendants' Exhibit 77–X. We simply believe the higher deviation figure to be without sufficient

policy justification. Indeed, the fact that the defendant's proposed variance can be so easily reduced only confirms the absence of any rational connection between the dictates of state policy and the configurations of the present plan.

in that order is effective to broaden participation in the political processes; and

WHEREAS, The districts drawn in that order conform with the legislative intent of ensuring the representation of minorities, including the Mexican-American population of Tarrant County, which is separate and diverse from other ethnic minority populations in Tarrant County; and

WHEREAS, The districts drawn in that order are effective to protect the integrity of the various political subdivisions in Tarrant County, including the city of Fort Worth and the surrounding cities, towns, and villages; and

WHEREAS, The districts drawn in that order closely parallel the districts drawn by the legislature in Chapter 727, Acts of the 64th Legislature, 1975; and

WHEREAS, Changes in the boundary lines of the districts drawn in that order would hinder enforcement of the election laws of the State of Texas by those charged with enforcement; now, therefore, be it

RESOLVED, by the House of Representatives of the State of Texas, That the house hereby approve of the legislative districts drawn in the court order of February 19, 1976, and encourage the United States District Court for the Western District of Texas to make that existing order, which establishes the following districts, final:

32A. That part of Tarrant County included in census tracts 130, 131, 134.01, 134.-02, 135.01, 135.02, 136.02, 137, 217.02, and 218, that part of census tract 65.05 East of the Handley-Ederville Road, and that part of census tract 136.01 included in census enumeration district 129 South of State Highway 121 and census block groups 3, 4, and 5;

32B. That part of Tarrant County included in census tracts 115.01, 115.02, 217.-01, 219, 220, 221, 222, 223, 224, 225, 226, 227, 228, and 229;

32C. That part of Tarrant County included in census tracts 42.02, 54.01, 54.02, 55.01, 55.02, 55.03, 55.04, 56, 57.01, 57.02, 58, 59, 60.01, 60.02, 111.01, and 111.02, that part of census tract 47 South of Gambrell Street, that part of census tract 109 South of U.S. Highway 377 and South of Old Benbrook Road, and that part of census tract 110.02 North of Sycamore School Road;

32D. That part of Tarrant County included in census tracts 22, 23.01, 23.02, 24.-01, 24.02, 25, 26, 27, 51, 52, 53, 106.01, 106.02, 107.01, and 107.02 and that part of census tract 109 North of U.S. Highway 377 and North of Old Benbrook Road;

32E. That part of Tarrant County included in census tracts 5.01, 6, 50.03, 66, 67, 101, 102, 104.01, 104.02, 105, 132.01, 138, 139, 140.01, 140.02, and that part of census tract 136.01 included in census enumeration districts 9A, 9B, 9C, 12, 14, 39, and 39B and that part of census enumeration district 129 North of State Highway 121, and that part of census tract 141 included in census enumeration district 47;

32F. That part of Tarrant County included in census tracts 1.01, 1.02, 2.01, 2.02, 3, 4, 8, 9, 10, 11, 12.02, 16, 17, 18, 32, 33, 34, 49, 50.01, 50.02, and that part of census tract 103 West of Haltom Road;

32G. That part of Tarrant County included in census tracts 12.01, 14.01, 14.02, 14.03, 15, 35, 65.01, 65.02, 65.03, 65.04, 132.-02, 133.01, 133.02, 216.01, 216.02, 216.03, and that part of census tract 13 North of the Texas and Pacific Railway and that part of census tract 65.05 West of Handley-Ederville Road and that part of census tract 103 East of Haltom Road;

32H. That part of Tarrant County included in census tracts 36.01, 36.02, 37.01, 37.02, 38, 39, 45.01, 46.01, 46.02, 46.03, 46.04, 46.05, 61.01, 61.02, 62, 63, 64, and that part of census tract 13 South of the Texas and Pacific Railway and that part of census tract 45.02 East of Bryan Street; and

32I. That part of Tarrant County included in census tracts 5.02, 7, 19, 20, 21, 28, 29, 30, 31, 40, 41, 42.01, 43, 44, 45.03, 48.01, 48.02, and that part of census tract 45.02 West of Bryan Street and that part of census tract 47 North of Gambrell Street.

JOHN H. WOOD, Jr., District Judge, dissenting:

Forewarned by other Supreme Court reversals of the majority in this very case, but still undaunted, this Court again sallies forth into the political thicket on another legislative reapportionment expedition. Again, the majority in this, its latest Opinion, without rhyme, reason, logic, foundation, fact or judicial precedent, has maneuvered an absolutely 180 degree about-face and has completely and totally reversed its earlier decision in this case approving the original State's Plan under which the last Texas legislative elections were conducted. This erratic and inconsistent vascillation in this case, which has been before the Supreme Court for over six years, constitutes another unconstitutional usurpation of the rights of the sovereign State of Texas. The only lame argument made for this reversal by my colleagues is that they doubt that the State plan, which up to this time has been the Court's approved plan, is in fact really a State plan since it may not have the imprimatur of the State and particularly the Texas Legislature.

When this Court adopted the State's plan instead of the plaintiffs' plan on February 19, 1976, the State's plan did not have at that time the imprimatur of the State Legislature and other branches of the Texas government that it now enjoys.[1] After H.B. 1097 was enacted voluntarily in 1975 by the Texas Legislature which eliminated all multi-member districts in the State after the Supreme Court had granted its Petition for Certiorari and after the Supreme Court had recertified this case back to this Court for us to decide if this State action had rendered this case "moot", the State of Texas submitted House Bill 1097 for clearance under Section 5 of Voting Rights Act to the Attorney General of the United States. By letter of January 23, 1976, the United States Attorney General interposed objections to the single-member district lines of three of the districts contained in House Bill 1097, including District 32 of Tarrant County which is involved here.

Therefore, this Court reconvened on February 9, 1976, only a short time before the April 3, 1976 elections, to consider the three remaining districts. Two of the districts were resolved by agreed Order of the parties. No compromise was reached with regard to Tarrant County. However, the State did come forward with the proposal which was adopted by the Court on February 19, 1976 and thus this Court rejected the plaintiffs' proposed plan which the majority now prefers.

The present State plan which is now under attack before this Court was originally prepared by State Representative Tom Schieffer and was endorsed by the 1976 Tarrant County legislative delegation. It was presented to this Court as the State's

1. See, e. g. Escalante v. White, D.C., 408 F.Supp. 1050. This Court's adoption of the State Plan was affirmed by inference by the Supreme Court when this case was returned to this Court for a determination of mootness. It has occurred to me that I might comment on the fact that if the Courts continue to take over and manage the reapportionment duties of the various States and adopt a Plan, the parties should be able to rely on the integrity and fairness of the U.S. Courts to adopt and maintain well-considered districting plans. Litigants should be able to rely on the Supreme Court as a Court of final jurisdiction whose decisions are final and consistent. Litigants should not, in making plans for the future involving heavy financial and business commitments, be relegated to the sorry proposition that litigation before the Federal Courts is decided by case-by-case ticket and a decision like a railroad ticket is good for this trip and this trip only. The majority of this Court should submit to the decision of the Supreme Court and proceed, as directed, to a determination of the mootness issue.

Plan by the Texas Governor and Attorney General.

On February 19, 1976, as stated, this Court adopted the State's proposed plan as amended by the Tarrant County legislative delegations as its own single-member district plan for District 32 in Tarrant County and thereafter the plaintiffs appealed this ruling to the Supreme Court and sought to stay the Judgment of the District Court. Mr. Justice Lewis F. Powell referred the plaintiffs' appeal to the full Supreme Court on March 1, 1976 and the action of this Court was in all things affirmed.

Thereafter, under such plan, the 1976 elections in Texas were conducted under the Reapportionment Plan adopted by this Court and approved by the Supreme Court.

It is obvious, therefore, that when this Court adopted the State's plan on February 19, 1976 (that is now in existence as the Court approved plan), the State's plan did not have the formal approval of the State Legislature and other branches of government, as well as the other local subdivisions of government in Tarrant County with which the existing plan is now endowed as will be demonstrated later. While the Court had some reservation in 1976 as to whether or not this plan had the imprimatur of the State of Texas, particularly that of the Legislature, this plan was adopted by this Court as one intended by the State to eliminate any possible constitutional infirmities that had heretofore been raised by the plaintiffs or the Attorney General of the United States and this Court agreed, in adopting this plan as its own, in the following language on February 19, 1976:

"The 1970 Census data supplied to the Court as well as the testimony adduced at the recent hearing in this suit, *DOES NOT DEMONSTRATE THAT EITHER OF THE TWO PLANS (I. E., SUB-MITTED BY PLAINTIFFS AND DEFENDANT RESPECTIVELY IS UNCONSTITUTIONAL*. Both plans provide for a primary district in which minority voters constitute a clear majority." (Emphasis added.) [2]

Not only does the State Plan which was adopted as the Court Plan in our earlier decision now have the State's legislative and executive imprimatur, but also enjoys the stamp of approval of all the democratically elected City Council and other local governmental bodies within the County of Tarrant as well as the imprimatur of this Court and the Supreme Court. This is the present existing plan upon which the State of Texas and its local subdivisions have relied in preparing voting lists, precinct lines and in making expensive preparations to carry out a plan that this Court has heretofore held "did not possess any constitutional infirmities".[3]

The majority gives lip service endeavoring to ascertain State policy and legislative intent of the State as follows:

"We of course recognize our duty to respect state apportionment policy. *See, e. g., White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971)."

It takes but the most cursory reading of the majority's Opinion and findings to determine that its duty with regard to respecting State apportionment policy has been totally and absolutely ignored.

Even if we follow the majority's erroneous finding that the defendants' plan is not a legislatively adopted or State approved plan and microscopically examine the two plans for indications of State policy and legislative intent, we must conclude that defendants have established the existence

---

**2.** *Graves v. Barnes (Graves III),* 408 F.Supp. 1050 (W.D.Tex.1976) (3-judge court). Reference to this earlier opinion will reflect, in pertinent part, the history of this protracted litigation. See also, *Graves v. Barnes (Graves I),* 343 F.Supp. 704 (W.D.Tex.1972); *Graves v. Barnes (Graves II),* 378 F.Supp. 640 (W.D.Tex. 1973).

**3.** *Graves v. Barnes (Graves III) supra.*

of identifiable and legitimate State goals and the closer congruence of the present plan to those goals. Since the present representatives were elected from the existing districts, final adoption of the present plan avoids pairing any representatives and maintains existing member-constituent relationships. Minimizing contests between incumbents is acceptable State policy. See *White v. Weiser,* supra; *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Taylor v. McKeithen,* 407 U.S. 191, 92 S.Ct. 1980, 32 L.Ed.2d 648 (1972); *Burns v. Richardson,* 384 U.S. 73, 89 n. 16, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966). Plaintiffs' plan would pair six of the nine representatives.

The majority ironically states that because its selection of the current districting plan for Tarrant County, Texas which was adopted in 1976 by this Court was "guided in no small way by constraints of time and practicability" it was an inconvenience to the political subdivisions of the State charged with conducting the elections for the Texas Legislature. The majority ignores the undisputed trial facts that these same conditions persist and are even worse at this time. The Court overlooks the evidence that the adoption of the plaintiffs' plan would affect the integrity of over seventy precincts in Tarrant County, while retaining the present Court plan would not cause any additional precinct charges. The voting precincts are, of course, the smallest political subdivisions with which voters identify.

The United States Supreme Court recently has acknowledged the possibility of using precincts to draw legislative districts. *Connor v. Finch,* 431 U.S. 407, 97 S.Ct. 1828, 1838, 52 L.Ed.2d 465 (1977). Adoption of plaintiffs' plan also would affect the integrity of the single-member district lines now existing in the City of Fort Worth. The preservation of political subdivision lines and historical boundaries has long been acknowledged by the Supreme Court as a rational and legitimate State goal. *Mahan*

*v. Howell,* 410 U.S. 315, 329, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Swann v. Adams,* 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967); *Reynolds v. Sims,* 377 U.S. 533, 578–79, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

The evidence further establishes that the adoption of plaintiffs' plan would make it virtually impossible for Tarrant County to comply with certain requirements of State election laws. Although the spring 1978 elections could probably be carried out on schedule, such a result could not be accomplished without great difficulty. A Court should not require precipitate changes that could make embarrassing demands on State election machinery. See *Reynolds v. Sims,* supra. Maintenance of the integrity of State election laws and their requirements certainly are legitimate State interests that would be served by permanent adoption of the present Court plan.

Defendants established that considerable voter confusion followed implementation of single-member district lines in Tarrant County as a result of the 1976 Order of this Court. Precincts with over the 3,000 voter limit established by State law were commonplace. Long lines at polling places resulted. Some voters were simultaneously registered in more than one precinct. Some candidates for election offices actually filed in the wrong precincts. The resolutions of the City Council of the City of Arlington and the Tarrant County Mayors' Council both cite the probability of more voter confusion and voter disenchantment on adoption of plaintiffs' plan as a reason for this Court to retain its present plan.

Now, single-member districts are in place under our previous Court adopted plan and Tarrant County has taken care during the past year to eliminate the over-large precincts and to reduce the voter confusion that occurred last year on implementation of those districts. Avoiding voter confusion and encouraging voter participation is a legitimate State goal and retaining existing districts to avoid extreme disruption of the

election process is acceptable. See *Chapman v. Meier*, 407 F.Supp. 649, 653 (D.N.D. 1975) on remand from 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975).

While I concur in the majority's rejection of the plaintiffs' claim that the State's Plan unconstitutionally dilutes the voting strength of the County's minority community and thereby denies minorities equal access to the electoral process, I strenuously disagree with the holding of the majority that the present State's Plan, which is now the adopted plan of the Court, violates the Fourteenth Amendment's equal protection requirement that legislative districts be "as nearly of equal population as is practicable".

Apparently, the majority is basing its decision as to the second point on the proposition that the present plan is not in fact the State Plan and that since "reapportionment is primarily the duty and responsibility of the State through its legislative or other body" the "mere endorsement of the plan adopted by this Court is insufficient to cause this Court to defer to such legislative effort" and states:

> "That deference contemplates a studied and thoughtful approach to the process of legislative apportionment, whereby the resulting legislation may be presumed to embody the legitimate concern of the general public."

This is incredible reasoning. To what extent must the Federal Courts police the minutes, the hours, the days and time that the legislative bodies spend in fashioning a redistricting legislative plan for Tarrant County which is merely one of 254 in the State of Texas?

It is true that after this Court adopted the State Plan in 1976 the Texas Legislature did meet and adjourn without introducing or passing any new redistricting lines for Tarrant County. The majority criticizes this absence of legislative action which I respectfully submit is totally unwarranted. If in our 1976 Order we had in fact instructed the Legislature to enact legislation, or even if we had suggested that it do so (and the Federal Courts are required to give the respective States every opportunity to correct their alleged mistakes [4]) there is little doubt that the State would have complied with such suggestion as it has always in the past. However, in view of this Court's 1976 Order adopting the Plan of the State of Texas and providing for further hearings only if the Plan failed to remedy constitutional deprivations suffered by minorities, the Legislature's lack of action must be viewed as approval *sub silentio* of the Court adopted plan. Of course, if the State were displeased with the present Court adopted plan, the State could have passed legislation establishing new districts. Finally, thereafter though, as heretofore observed whatever doubt might have existed previously as to the State's legislative intent, it was clearly dispelled by the adoption of two separate resolutions of the Texas Legislature, one by the Texas House of Representatives and another by the Texas Senate, expressly setting forth State policy embodied in the defendants' plan which the Court had previously adopted as its own. This is conclusive of the State's legislative intent, especially where the resolutions specifically prescribed the districts presently existing in Tarrant County.

Plaintiffs' response to the onslaught of evidence of legislative intent, State goals and policy offered by the defendants is twofold. First, they suggest that the existence of H.B. 1097, as amended, House Resolution No. 3 and Senate Resolution No. 2 (resolutions adopting the present Court plan as that of the Texas Legislature), the Resolution of the Tarrant County Mayors' Council, consisting of all 31 Mayors from 31 cities in Tarrant County, the Commissioners of the County of Tarrant and the Resolutions of the Fort Worth and Arlington City Councils should be ignored because they are all the result of malignant motives or ill-consideration. Plaintiffs are, in effect, ask-

4. *Graves v. Barnes (Graves I)*, 343 F.Supp. 704 (1972).

ing this Court to conclude that all of the elected State Representatives, State Senators, Mayors and County Commissioners in Tarrant County as well as members of the Arlington City Council are guided in their official acts in petitioning this Court for approval of the present Court adopted plan by motives of discrimination or are in the habit of adopting official resolutions or acts without appropriate study, conception or consideration. I refuse to make such an outrageous assumption and I respectfully submit further that the endorsement by all of these bodies who are vitally concerned with this reapportionment problem refutes the contention of the majority that there was a failure to conduct "a studied and thoughtful approach to the process of legislative apportionment". Second, plaintiffs suggest, and apparently the majority agrees, that this Court is not required to pay any heed to such clear legislative intent and mandate.

In urging this result, plaintiffs and the majority seem to rely on a somewhat similar passage in *Wallace v. House*, 538 F.2d 1138 (5th Cir., 1976). This case has no applicability to this "single-member" reapportionment case involved here since the complete passage in that case is that "the Court may pay no heed to legislative preference *FOR AT–LARGE DISTRICTS*", (which are no longer involved here), *id.* at page 1140 (Emphasis added.) *See also East Carroll Parish School Board v. Marshall.*[5]

In *Graves v. Barnes No. 1, supra*, my colleagues in this very case also criticized the entire State's plan in 1971 because it was allegedly not a product of legislative action, but rather was the action of a "Board of five members, only one of whom is a member of the Legislature". Under the Texas Constitution, the Board is authorized to act to reapportion if the Legisla-

ture fails to do so. The Board attacked by the majority in this case consisted of the Lt. Governor, the Speaker of the House of Representatives, the Land Commissioner and the Comptroller of Public Accounts, which Board acted in this case under the advice and counsel of the Attorney General of Texas. Here again, the majority concluded, "We have serious doubt that this Board did a sort of deliberate job contemplated by *Reynolds v. Sims* as worthy of judicial abstinence."[6] The Supreme Court obviously rejected this finding of the majority in holding that the Board's actions in this reapportionment case did constitute valid State action and the redistricting plans under attack by the majority were affirmed in keeping with my Dissenting Opinion in that case.

At a time in the distant past, the test of constitutionality of State action seemed to depend on whether or not it could be shown that the action was arbitrary, unreasonable or capricious. As Mr. Justice Brandeis stated in the case of *O'Gorman and Young*, presumption of constitutionality must prevail in the absence of some factual foundation of record for overthrowing the action.[7] See also "The Presumption of Constitutionality", 31 Col.L.Rev. 1136, (1931).[8]

After the majority adopted the State Plan on February 19, 1976 and rejected the plaintiffs' plan, all of which action the Supreme Court affirmed, the majority in this decision have now changed their minds and have decided that the plaintiffs' plan is preferable. Why? Certainly not because the State's Plan is unconstitutional since the majority readily concedes that both plans are absolutely constitutional, but rather base their decision on the new and unheard-of concept solely on *"EQUITABLE CONSIDERATIONS"*. (Emphasis added.) This is totally contrary to the holding in

---

5. 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).

6. *Graves v. Barnes (Graves I), supra.*

7. *O'Gorman and Young v. Hartford Fire Ins. Co.*, 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324.

8. *Graves v. Barnes (Graves I)*, 343 F.Supp. 749.

*Whitcomb v. Chavis*[9] and its progeny which holds:

"But we have insisted that the challenger carry the burden of proving that multi-member districts unconstitutionally operate to dilute or cancel the voting strength of racial or political elements."

The Supreme Court further concludes in this case that there is "no evidence that all of the multi-member districts were conceived as purposeful devices to further racial or economic discrimination".[10]

This dictatorial and unconstitutional usurpation of political power by this type of "government by judicial decree" demonstrates the reasons that Federal Judges are being constantly reminded by State officials, constitutional lawyers, editorial writers, newspapers, television, radio and other media that our system of government was designed by our founders to be a democratic one . . . that this country by the Declaration of Independence, the Bill of Rights and the Constitution itself, divorced itself from monarchs, life tenured despots and tyrants and they further contend that this should include the arbitrary, unwarranted and unconstitutional intrusion of Federal Judges into the democratic process of the State governments.

In this particular case, after adopting the Plan submitted by the State of Texas in 1976, the majority again failed to respond to the inquiry submitted to us by the Supreme Court as to whether or not this case was, by the adoption of single-member districts, rendered "moot". Instead, the majority followed its past policy and attempted to keep continuing jurisdiction over this case as it had in the past, in effect retaining the power to manage every detail of the affairs of the State of Texas in reapportionment matters as it has done during the past almost seven years, and it again opted in 1976 to endeavor to retain control over the administration of this State's legislative, executive and local subdivisions of government in Tarrant County. Apparently, the majority has an inordinate determination to continue its domination of the sovereign State of Texas in this reapportionment case by such perpetual unconstitutional intrusion in and usurpation of those democratic processes which are clearly and unequivocally reserved by the Constitution of the United States to all of the sovereign States. How can the Judiciary expect others to abide by the Constitution and support it when the Federal Judges flagrantly violate it in this fashion?

As I pointed out in *Graves v. Barnes No. 2*, it cannot be denied that this type of legislative reapportionment civil rights case is an emotionally charged one in which competing political philosophies and methods often clash and unrestrained and electrifying charges of racial or other ethnic discrimination are heatedly made.[11] This is an area in which the Federal Judiciary must, indeed proceed with extreme caution.[12]

The remedy of imposing Court drawn single-member districts is the most radical that equity could require and is one which should be imposed only after setting aside on supportable grounds other alternatives found adequate. *Whitcomb v. Chavis*, 403 U.S. at page 160, 91 S.Ct. 1858, *supra.*

The Supreme Court has repeatedly admonished that the District Courts ". . . should not pre-empt the legislative task nor 'intrude upon State policy more than necessary . . . .'" *White v. Weiser*, supra, 412 U.S. at page 795, 93 S.Ct. at page 2355. Thus, ". . . judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Reynolds v. Sims, supra,* 377 U.S. at 586, 84 S.Ct. at 1394. *See also White v.*

---

**9.** 403 U.S. 124, 144, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).

**10.** *Graves v. Barnes (Graves III) supra.*

**11.** 378 F.Supp. 640 (1974).

**12.** *Graves v. Barnes (Graves II), supra,* at pages 683–684.

*Weiser, supra,* 412 U.S. at pages 794–795, 93 S.Ct. at page 2348. Furthermore, the approval of these plans by the representatives from each district is a clear expression of legislative intent. Also, assuming even that plaintiffs' plan is preferable, which I dispute, judicial courtesy would require the adoption of a plan which has been previously approved as constitutional by this Court and adopted by separate distinct resolutions of the two Houses of the State Legislature as well.

Since the sole and only reason that the Supreme Court returned this case to us was to determine whether or not the State's voluntary adoption of "single-member" to replace "multi-member" legislative districts throughout the State was now moot, I feel that we should address ourselves to this question, although the majority has not done so. In this connection, I respectfully submit that in Texas the single-member districts created in all of the 254 Counties now provide all of the body politic and voters with effective access to the political process and having attained these goals it is now time for the surrogate Federal Courts to step aside and again let Democracy run its course.

From the beginning the Supreme Court has recognized that reapportionment is solely a matter for State determination, usually by the State Legislature, and determination and judicial relief becomes appropriate only when the legislative intent to reapportion according to Federal constitutional standards and requirements is not met. *Reynolds v. Sims,* 377 U.S. 533, 586, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). In *White v. Weiser,* 412 U.S. 783 at page 795, 93 S.Ct. 2348 at page 2355 (1973), the United States Supreme Court held:

> "Just as a federal district court, in the context of legislative reapportionment, should follow the *policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed in the State legislature,* whenever adherence to state policy does not detract from the

requirements of the Federal Constitution, we hold that a district court should similarly honor state policies in the context of congressional reapportionment. *In fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the Legislative task nor intrude upon state policy any more than necessary."* (Emphasis added.)

It must also be observed that the Mexican-American community in Tarrant County favors neither plan, but has submitted a third plan for consideration by the Court.

In a situation like the present one, where alternative reapportionment plans are before the Court, we are obligated to choose the plan that most nearly approximates the reapportionment plan of the State Legislature, while satisfying constitutional requirements. *White v. Weiser,* 412 U.S. 783 at 797, 93 S.Ct. 2348.

The instant case is unique in many ways from the cases establishing the standards to be applied in the area of one-man, one-vote, one of which is that it marks the only occasion known to this Court when the one-man, one-vote principle has been applied to only a few districts involved in the selection of the representative body. The nine State representatives elected from the districts in question will be only nine of the 150 members of the Texas House of Representatives. Whatever plan we adopt, the people of Tarrant County will find themselves in districts that are both larger and smaller than other legislative districts in the State, which is permissible as affording reasonable guarantees of equal protection to the voters of the entire State under *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

Last year in this very case in adopting the State's plan, we approved redistricting plans that were drawn for legislative districts in Jefferson County and Nueces County in the same manner as described by Representative Schieffer for Tarrant County, i. e., district lines were redrawn in an effort to resolve objections raised by the United States Attorney General. The devi-

ation among districts approved by this Court for Jefferson County was 8.1% and Nueces County was 10%.

As we noted in 1976, it would seem beyond dispute that 7.7% deviation in an apportionment plan adopted by a State legislature does not violate the Federal constitutional requirements of one-man, one-vote. *Graves v. Barnes*, 408 F.Supp. 1050, 1053 (1976). Also, as the United States Supreme Court in 1973 made clear by correcting us in this same case, not all population deviations must be justified by "acceptable reasons" grounded in State policy. *White v. Regester*, 412 U.S. 755, 761, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). It is also clear that the present plan does embody legitimate and identifiable State policy and the legislative intent is crystal clear.

Of course, a Court-ordered plan "must be held to higher standards than a State's own plan". *Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975). Unless there are persuasive justifications, a Court-ordered reapportionment plan of a State legislature must ordinarily achieve the goal of population equality with little more than *de minimis* variation. *Connor v. Finch*, 431 U.S. 407, 97 S.Ct. 1828, 1833, 52 L.Ed.2d 465 (1977); *Chapman v. Meier, supra*, 420 U.S. at 26–27, 95 S.Ct. 751. Substantial population deviations such as 19.3% and 16.5% for legislative districts, "simply cannot be tolerated in a court-ordered plan in the absence of some compelling justification". *Connor v. Finch*, 431 U.S. 407 at page 417, 97 S.Ct. 1828 at page 1835.

Even ignoring the imprimatur of the Texas Legislature and the local subdivisions within Tarrant County as to the State plan, it is interesting to observe that the plan's deviation of 7.7% is certainly not of the magnitude of the ones in *Connor* or the 20.14% found in *Chapman v. Meier, supra*, and does not require a compelling justification. Apparently, no Court has ever found a deviation of 7.7% to be unacceptable in a court-ordered plan. To the contrary, we have ourselves previously approved plans of 8.1% and 10% for districts in Texas and

other Courts have approved plans with similar deviations. *E. g., Perry v. City of Opelousas*, 515 F.2d 639 (5th Cir., 1975) (6.2%); *Chapman v. Meier*, 407 F.Supp. 649 (D.N.D. 1975), on remand from 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975) (6.6%).

This Court is left, however, with the task of deciding whether the present plan's deviation of 7.7% is beyond the threshold of plans that are acceptable without any justification. *See Parnell v. Rapides Parish School Board*, 425 F.Supp. 399 (W.D.La. 1976). The situation is not unlike the one we initially confronted in this very case in 1972 when we read the cases to require the State of Texas to justify its deviation of 9.9%. The Supreme Court corrected us in this very case in that error. *White v. Regester, supra.*

The results of the 1976 election under the State Court's adopted present plan which is now under attack are undisputed. Of the nine members elected, one is Black, the remaining are Anglo. Strictly in terms of proportional representation, by race, the result is that the Black population, which makes up approximately 11.7% of the total population of Tarrant County, has elected a member of the Texas Legislature who represents 11.1% of the total population. There is no Mexican-American Representative, but it has been acknowledged that the 6% Mexican-American population is scattered throughout Tarrant County. This mechanistic method of determining equality of access by proportional representation, however, is inappropriate. *White v. Regester, supra*, 412 U.S. at 765, 93 S.Ct. 2332; *Whitcomb v. Chavis, supra*, 403 U.S. at 149, 91 S.Ct. 1858; *Kirksey v. Board of Supervisors of Hinds County*, 554 F.2d 139, 143 (1977). The real determiner is whether members of the group in question can participate in the political processes and elect legislators of their choice, whatever may be their race. *White v. Regester, supra.*

In arguing that the present plan is unacceptable as a court-ordered plan, plaintiffs rely exclusively on *Kirksey v. Board of Supervisors of Hinds County*, 554 F.2d 139

(1977) (en banc) and the full meaning of this case remains uncertain while it awaits United States Supreme Court review.

This case was originally instituted by other plaintiffs in 1971 and, as previously noted has been before the Supreme Court since 1972 in one form or another. There is little wonder, after the Supreme Court had granted its latest Petition for Certiorari in this case in 1976 (after the State had voluntarily adopted single member districts to replace its multi-member districts), the Supreme Court promptly remanded this case back to this Court "for reconsideration in light of the recent Texas Reapportionment legislation and for dismissal if the case is, or becomes, moot." *White v. Regester,* 422 U.S. 935, 95 S.Ct. 2670, 45 L.Ed.2d 662 (1975). It is paradoxical that the majority has not once since this case was referred back to this Court in 1976 even addressed itself to the Supreme Court's Mandate to determine "mootness" which was the only reason for its return to us.

Seemingly, the majority is determined to continue this as a perpetual case always open to new charges, additional suits and other controversies and complaints from anyone and everyone, apparently desirous of having this 1971 case "go on and on" ad infinitum, somewhat like Tennyson's proverbial "Brook".

As heretofore observed, the Supreme Court has recognized that reapportionment is exclusively and solely the responsibility of the States, primarily the legislative bodies thereof. Judicial relief becomes appropriate only when the challenging plaintiff proves by a preponderance of the evidence that the State has failed to create a plan that meets constitutional requisites. *Whitcomb v. Chavis, Reynolds v. Sims* and *White v. Weiser, supra.* The challenger has the burden to establish and prove that the State Plan *"UNCONSTITUTIONALLY OPERATE TO DILUTE OR CANCEL THE VOTING STRENGTH OF RACIAL OR POLITICAL ELEMENTS."* (*Whitcomb v. Chavis,* emphasis added.) If, in fact, the Court does find the plan unconsti-

tutional, it must then use "equitable discretion" and "principle" to fashion a new plan for the district. However, the Court cannot use *"equitable discretion"* or "determine whether it may stand as a matter of *principle"* (emphasis added) to determine the plan's validity, *vel non,* as the majority has done in this case, since this first threshold question must be determined solely and exclusively on constitutional grounds before it reaches the equitable question of fashioning a plan. (*Whitcomb v. Chavis, Reynolds v. Sims* and *White v. Weiser, supra.*)

The implications of this novel and latest extension of judicial management into the purely State and local reapportionment affairs (WHERE CONSTITUTIONAL CONSIDERATIONS ARE ADMITTEDLY NOT CONTROLLING) are shocking and perhaps are monumental in scope. If these new standards adopted by the majority stand as unchallenged judicial precedent in Texas and in other sovereign States, the thicket in this thorny legal area will indeed become totally impenetrable. Such unparalleled and unprecedented "Government by Judicial Decree" is unfortunate and contemplates and encourages the spawning of endless and uncertain needless litigation in this very sensitive and controversial field of State-Federal relations.

## CONCLUSION

1. Since even the majority holds that the present plan does not unconstitutionally "dilute or cancel the minority" voting strength or access to the political process, the present plan which has the imprimatur of the State Legislature and all of the political and governmental subdivisions in Tarrant County as well as the prior approval of this Court, which action was affirmed by the Supreme Court, this Three Judge Court has the obligation and responsibility to adopt the present plan as a final plan.

2. While the present single-member district reapportionment plan for Tarrant County is sufficient as a State legislatively adopted plan, it also conforms to all the

requirements for a Court-ordered reapportionment plan under all judicial precedent.

3. Since the plaintiffs, as the challengers, have not sustained their burden to establish the State's Plan, which is also this Court's adopted Plan, to be an unconstitutional Plan, it must be reaffirmed and readopted by this Court.

4. In response to the specific inquiry of the Supreme Court, I would find that the Texas Reapportionment Plan now in existence is constitutional and would, therefore, *HOLD THIS CASE IS NOW MOOT.*